DOROTHY O. SIMON, Plaintiff-Appellant, *v.* LUMBERMENS MUTUAL CASUALTY COMPANY, Defendant-Appellee.

First District (3rd Division)    No. 62060

Opinion filed February 9, 1977.—Modified on denial of rehearing October 12, 1977.

SIMON, P. J., dissenting.

Kamin, Stanley & Balkin, of Chicago (Frank C. Stanley, of counsel), for appellant.

Clausen, Miller, Gorman, Caffrey & Witous, of Chicago (James T. Ferrini, Frank L. Schneider, and William J. Sneckenberg, of counsel), for appellee.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

The plaintiff, Dorothy O. Simon, is the widow of George Simon, the named insured. She seeks to recover on two policies of insurance issued by the defendant Lumbermens Mutual Casualty Company. The "Travel Accident Policy" upon which the plaintiff seeks recovery provides insurance against a specified loss resulting from "bodily injury caused solely by an accident and resulting directly and independently of all other causes * * * while driving or riding in * * * a private passenger automobile * * *."

The "medical payments" coverage of the automobile policy upon

which the plaintiff seeks to recover provides for the payment of necessary medical and funeral services for a named insured who "sustains bodily injury, sickness or disease, including death * * * caused by accident * * * while occupying the owned automobile * * *."

Three witnesses testified at the jury trial: The plaintiff, Dorothy O. Simon, Mr. Joseph Shulruff, and Dr. Henry B. Goldt.

On date of decedent's death, November 29, 1970, the decedent who had been under doctor's care for 1½ years for high blood pressure but was apparently in good general health, attended a tombstone dedication ceremony for a deceased relative with his wife and other friends and relatives. The decedent intended to leave for a business trip directly from the cemetery. After the dedication, the decedent walked plaintiff to the car of a nephew who was to take her home. He kissed the plaintiff goodbye and proceeded to his car which was second in a single file of cars which was preparing to leave the dedication site. The car in front of the decedent was being driven by Mr. Siegel who was deceased at time of the trial. Behind the decedent was a car driven by Mr. Joseph Shulruff, a relative of the plaintiff. Shulruff testified that he noticed nothing unusual about the decedent that day; that around noon, after the dedication, there were several cars lined up single file on the narrow road; these cars remained motionless for three to five minutes during which time he could see decedent sitting alone in his car with the motor running and the brake light on. As he looked up again he saw the decedent's car "take off" and hit the rear end of Siegel's car pushing that car about fifteen feet ahead into an archway on the cemetery road. Shulruff testified that he ran to decedent's car, opened the driver's door and found the decedent "slumped" to the right. He turned off the engine and helped decedent to a sitting position. He testified the decedent was "gasping for air," "gagging and his eyes were bulging * * * sort of rolling." He described the decedent's color as "yellowish." He noticed no blood or mark of injury on the decedent. Shulruff went to call an ambulance while an uncle aided the decedent. The decedent's car sustained only minimal damage. When the ambulance arrived the decedent was given oxygen and transported to Loyola Hospital.

The plaintiff testified that she and the decedent had been married for 28 years at the time of the occurrence; that she was familiar with his general health and noticed nothing unusual about his appearance or health on the day of the incident. He seemed in good spirits. The decedent had never lost any time from work during the prior two years as a result of sickness. The plaintiff testified that the decedent had been under the care of Dr. Henry B. Goldt for about a year and a half prior to his death and was being treated and taking prescribed medication for high blood pressure. The decedent who had seen Dr. Goldt two days prior to his death had

indicated to the plaintiff after his visit to the doctor that his health was "A-Okay." He was happy because they had a "nice long vacation coming up." The plaintiff had left the cemetery before the incident occurred. She later was called to Loyola University Hospital where she was notified of her husband's death. She had no knowledge of any physical injury to the body.

Dr. Henry B. Goldt testified by way of an evidence deposition taken September 29, 1972, two years after the accident and 2½ years before the trial. He stated that he had treated the decedent for high blood pressure from July 29, 1969, until November 27, 1970. The last time he saw the decedent, two days before the incident, he found the decedent to be "in pretty good balance, medically speaking," and the decedent had no subjective complaints and "was feeling good."

On November 29, 1970, Dr. Goldt, received a telephone call about 1:30 p.m., from a police officer or relative who told him that decedent had expired about an hour before. He was asked to sign the death certificate and did so later that day at his home indicating the cause of death as acute coronary thrombosis. He never viewed the body.

Dr. Goldt was given a hypothetical situation which restated the facts of the instant case in some detail. He was then asked:

"Q. Now, Doctor, assuming the facts that I have related to you to be true and based upon those facts and based further upon the care and treatment, diagnosis and examinations you have made of Mr. Simon, do you have an opinion based upon a reasonable degree of medical and scientific certainty as to the cause of the condition of the acute coronary thrombosis?

* * *

A. Well, my opinion is corroborated by the fact I signed the death certificate as an acute coronary thrombosis with a secondary diagnosis of pre-existing hypertensive heart disease and therefore as a logical opinion sudden death brought on by the trauma of the accident could have caused acute coronary thrombosis.

Q. Then your opinion is that the—

A. It caused his death.

Q. What caused the coronary?

A. Well, the coronary could have been caused by the trauma.

Q. The accident?

A. Yes, or hypertensive disease."

On cross-examination Dr. Goldt was asked:

"Q. Let me ask you this directly then, Doctor: You have given the opinion that the thrombosis could have been precipitated by some trauma of an accident.

Aren't we really speculating as to whether the heart attack was caused by some trauma in an accident rather than its being the causation of the accident?

A. Well, I can't say that it's speculation. I was not a witness of the incident, so I can't tell you whether it's speculation or fact. All I can say is this: That one of the precipitating factors for an acute coronary thrombosis is a traumatic incident such as was described here or anything that would send the man's blood pressure up and precipitate the thing.

Q. Well, let me follow that a little further, Doctor. You said you weren't a witness to the accident so you weren't there to see what happened?

A. That's right.

Q. Okay. Well, on the basis of knowing that the person sat in the car and that the car shot forward suddenly and that people ran up and opened the door and this person was there breathing heavily with his eyes rolled, the vehicle was in the drive position, the ignition was still on, is there any way for you to tell on the basis of that whether the accident caused the heart attack or the heart attack caused the accident?

A. I would have to say no."

At the close of the plaintiff's evidence the trial court allowed the defendant's motion to strike the testimony of Dr. Goldt, and directed a verdict and entered judgment in favor of the defendant and against the plaintiff.

Plaintiff appeals alleging that the court was in error in striking the doctor's testimony, and in directing the verdict and entering judgment for the defendant and against the plaintiff.

In *Sommers v. American Economy Insurance Co.* (1972), 8 Ill. App. 3d 450, 289 N.E.2d 712, the plaintiff, wife of the insured decedent, appealed from a directed verdict granted after the testimony of the expert medical witness was stricken by the trial court as being speculative and based on conjecture. In that case, the decedent died apparently of a heart attack while driving his car in the driveway of his place of employment. His car moved sideways on the icy driveway and struck a snowbank sustaining minimal damage. When first observed the decedent appeared to be short of breath and grabbing at his chest. He then slumped against the steering wheel. He died shortly thereafter. Dr. John Paul, the physician who treated the decedent for his heart condition, was given a hypothetical situation and was asked if he had an opinion within a reasonable degree of medical certainty as to the cause of death. Dr. Paul stated, "He possibly died of a heart attack." He felt there "possibly could be" a causal

connection between the accident and the heart attack. The doctor was not at the scene, he did not pronounce the decedent dead, and there was no autopsy performed.

After cross-examination of the witness the trial court in *Sommers* held his testimony to have been based on guess and speculation and ordered the hypothetical question and all subsequent testimony of the doctor stricken. The appellate court affirmed, stating at page 452:

> "The question of whether Dr. Paul's testimony was properly stricken is governed by the established rule that, in giving an opinion, an expert witness is not permitted to guess nor is he allowed to base the opinion upon conjecture. (*Lyons v. Chicago City Ry. Co.*, 258 Ill. 75, 80-82 (1913); *Schwartz v. Peoples Gas Light & Coke Co.*, 35 Ill. App. 2d 25, 31, 32 (1962).) The Doctor's statements, quoted above, and a review of his testimony as a whole, leave no doubt that his opinion was based upon guess and conjecture and that it was properly stricken from the record." 8 Ill. App. 3d 450, 452.

The similarities between the instant case and *Sommers* are obvious. Here, while decedent was sitting in his car on a narrow road in the cemetery, his car lurched forward striking the car ahead. The car sustained only minimal damage. When first observed by Shulruff the decedent was gasping for breath and slumped toward the passenger side of the car. Shulruff observed no injury to the decedent who died about 25 minutes later.

■■ ■ Dr. Goldt, the physician who treated the decedent for high blood pressure, when asked to give his opinion as to the cause of death stated the coronary could have been caused by the accident or by hypertensive disease. He was not on the scene nor did he view the body. He signed the death certificate at his home. Although it is true, as plaintiff contends, that the medical expert's testimony need not be based on absolute certainty (*Nowicki v. Union Starch & Refining Co.* (1971), 1 Ill. App. 3d 92, 272 N.E.2d 674) but only a reasonable degree of medical and scientific certainty that the accident could or might have caused the coronary (*Redmon v. Sooter* (1971), 1 Ill. App. 3d 406, 274 N.E.2d 200), nevertheless in order for the expert's testimony to be admissible, something more than mere guess or surmise is required. We can only conclude that Dr. Goldt's testimony was mere speculation and conjecture and was properly stricken. *In re Union Drainage District* (1976), 39 Ill. App. 3d 862, 350 N.E.2d 865.

The plaintiff draws our attention to the case of *Scholle v. Continental National American Group* (1977), 44 Ill. App. 3d 716, 358 N.E.2d 893. In *Scholle* the decedent fell from a platform surrounding her swimming pool where she had been standing using a skimming net to remove floating

leaves from the pool. She fell a distance of 2½ feet striking some decorative stones which surrounded the pool. The decedent's husband testified that he helped her up and that she said she lost her balance, started to fall into the water, overcompensated and fell backward off the deck. She had soreness in her head and neck area. Her husband noted that there was a slight redness but no bruises nor breaks in the skin. The decedent complained of a headache and not feeling well. The next morning after going to church she went to bed complaining of a headache and a stiff neck. Later that day she complained of an even worse headache and collapsed. She was taken to the hospital. The testimony indicated that she had been physically active and apparently in good health prior to the occurrence.

The neurosurgeon, Dr. Minster, testified that he conducted an examination and that he gave an angiogram that showed the patient had an aneurysm. He stated that there were no known tests to show how long the aneurysm had existed. Before he had an opportunity to operate the patient suddenly died. He testified that the fall could or might have contributed in whole or in part to the rupture of the aneurysm and that the trauma could not be ruled out as a cause of the rupture. He was asked if when the aneurysm ruptured they are occasionally preceded by leaking. He stated that no one really knows. He said that if there were any sumptoms of the leaking aneurysm, which is arguable in the medical community, it is thought that the symptoms would be headaches, stiff neck, a vague complaint of something being wrong and possibly some trouble with thinking. Aneurysms are congenital and can suddenly rupture without any warning. He could not give an opinion based on the reasonable degree of medical certainty whether the decedent's aneurysm came from the trauma or whether it ruptured spontaneously. He stated although it was possible that the rupture originally could have occurred as a leak causing a momentary imbalance resulting in the fall he assumed it was otherwise because the symptoms followed the fall and because it would be unusual for loss of balance to precede the symptoms of a headache and a stiff neck.

Two other experts testified. One stated that an aneurysm can rupture with a slow leak which would generally produce symptoms such as stiffness of the neck, headaches and dizziness. Another medical expert testified that the fall was symptomatic of a rupture of the aneurysm although he admitted no one could tell with certainty what an independent fall would do to the aneurysm. He indicated that when an aneurysm is about to rupture it leaks and causes symptoms that include headaches, nausea, vomiting, dizziness and loss of control.

The plaintiff asserts that *Scholle* holds that although the plaintiff's medical expert could not give an opinion based on a reasonable degree of

medical certainty that Mrs. Scholle's fall caused the ruptured aneurysm, medical evidence that the fall could have caused the rupture, together with circumstantial evidence to the effect that Mrs. Scholle had previously been in good health and that the symptoms of the ruptured aneurysm first appeared immediately after the fall presented a question as to whether the death was caused by the fall. We read *Scholle* differently. The court there held that even though the medical witnesses could not state with a reasonable degree of medical certainty that the fall was the cause of death, there was substantial value in the testimony because the witnesses testified to the full extent of their medical knowledge where medical knowledge did not permit an unqualified unequivocal opinion. Also, the medical testimony served to narrow the reasonable probabilities of causation. None of the witnesses excluded the possibility that the fall could have caused the aneurysm to burst. It showed that an unruptured aneurysm does not cause symptoms, but that upon the rupture the principle initial symptoms are headaches, stiff neck, dizziness, nausea, difficulty in thinking, and loss of muscular control. Dr. Minster was asked if it were possible that the rupture originally could have occurred as a leak causing a momentary imbalance resulting in the fall. He responded that it was possible, but that he assumed otherwise because the symptoms followed the fall and because it was unusual for loss of balance to precede the symptoms of a headache and stiff neck.

In contrast to this narrowing of possibilities in *Scholle* we have the testimony here of Dr. Goldt who gave a bare opinion without any elaboration or explanation that the coronary could have been caused by the trauma or hypertensive disease. In determining whether the testimony of any witness has any probative value it must be measured against the factual issues raised in the case. In *Scholle* there was a sufficient amount of circumstantial evidence based on the testimony of the decedent's husband and the attending doctor that there was no indication of any symptoms of an aneurysm prior to the fall, but immediately after the fall the plaintiff began to exhibit symptoms. In the instant case, the testimony concerning the incident is not nearly as clear. There is testimony that prior to the occurrence the decedent was in good health. There is also testimony that he had been treated by Dr. Goldt for 1½ years and up until two days prior to the incident for high blood pressure. He also testified that anything that increases a man's blood pressure can precipitate a coronary thrombosis. Dr. Goldt testified that medically speaking he was in pretty good balance the last time he had seen him. Apparently Dr. Goldt had reservations about his medical condition because when he signed the death certificate someone asked him what would be the obvious cause of death he responded, "[F]or a man with hypertensive heart disease, it could have been an acute coronary thrombosis." The

situation differs markedly from *Scholle* where there is no indication at all that Mrs. Scholle had been ill prior to the occurrence and the testimony was that the aneurysm could have been caused to burst by the fall and may not have ruptured at any particular time otherwise.

We fail to see that the testimony of Dr. Goldt had any probative value under the circumstances. We can only characterize his testimony, as did the court in *Sommers,* as being speculative.

Plaintiff argues that the rationale of *Carlson v. New York Life Insurance Co.* (1966), 76 Ill. App. 2d 187, 222 N.E.2d 363, should be adopted by this court. In that case the plaintiff argued:

> " * * * the fact that the disability is the result of the combined effect of an accidental injury and a preexisting disease, does not necessarily preclude recovery; and that under such circumstances, the right to recover is dependent upon whether the accidental injury was the 'proximate cause' of the resulting loss or disability. Kater v. United Ins. Co. of America, 25 Ill. App. 2d 22, 30, 165 N.E.2d 74 (3d Dist. 1960) * * *." (76 Ill. App. 2d 187, 194.)

Without Dr. Goldt's testimony there is insufficient evidence in the record for the case to be submitted to the jury to determine that the death was proximately caused by the accident. The jury could only speculate as to whether or not the accident had anything to do with the cause of death.

For the above reasons we find that the trial court properly directed a verdict and entered judgment for the defendant and against plaintiff.

Affirmed.

McNAMARA, J., concurs.

Mr. PRESIDING JUSTICE SIMON, dissenting:

I disagree with the majority's statement that there is a difference between the situation presented by this appeal and that in *Scholle v. Continental National American Group* (1977), 44 Ill. App. 3d 716, 358 N.E.2d 893. Dr. Minster's testimony for the plaintiff in *Scholle* did not provide any more substantial foundation than Dr. Goldt's testimony in this case for concluding that the respective deaths were caused by an accident; accordingly, Dr. Goldt's testimony should not have been stricken.

In *Scholle,* Dr. Minster testified that he "could not give an opinion based upon a reasonable degree of medical certainty whether Mrs. Scholle's aneurysm came from the trauma or whether it ruptured simultaneously." Here, after testifying that the coronary could have been preceded by the trauma, Dr. Goldt conceded that there was no way for him to tell whether the accident caused decedent's heart attack or

whether the heart attack caused the accident. Thus, the only information of probative value added by Dr. Minster was that although the aneurysm could have started as a leak causing a momentary imbalance which resulted in the fall, he assumed otherwise because "the symptoms followed the fall and because it would be unusual for loss of balance to precede the symptoms of a headache and stiff neck." Dr. Goldt's testimony was not based on guess or speculation any more than was the expert testimony in *Scholle*, and I fail to see how Dr. Minster's assumption added anything to his opinion substantial enough to distinguish the quality of the expert testimony in *Scholle* from Dr. Goldt's testimony in this case. This is particularly so because Dr. Minster also testified that an "aneurysm could suddenly rupture without any warning and that upon rupture it would be possible for a person to pass out and momentarily lose balance as an early sign of the rupture." This testimony was consistent with the defendant insurance company's hypothesis that Mrs. Scholle's physical problems preceded her fall.

Because we do not, of course, have the record in *Scholle* before us in this case, all we know of the evidence in *Scholle* is what appears in the reviewing court's opinion. Yet, the bottom line of that opinion in regard to our case is the court's summary of the evidence:

"In the present case, the experts testified to the full extent of their medical knowledge when they established that the fall could have caused the rupture as well as the opposite result. Having done so they had no more information to offer the jury. The effect and weight to be accorded to the fact that the symptoms of the burst aneurysm appeared immediately after decedent's fall thus was completely within the province of the jury and the resolution of the issue did not require expert testimony." 44 Ill. App. 3d 716, 722.

The quality and extent of the evidence in *Scholle* is strikingly similar to that presented in this case. Two opposite inferences—that Mr. Simon had a heart attack before his car lurched forward or that the car lurched forward causing the heart attack—could have been drawn from that evidence. Accordingly, as in *Scholle*, the jury here should have been left to draw the decisive conclusion as to what happened first.

Although the majority attempts to distinguish *Scholle* by pointing out that Mrs. Scholle had not been ill prior to her fall, while Mr. Simon had been treated for high blood pressure before his death, this argument does not take into account that here, both Mrs. Simon and Dr. Goldt testified that Mr. Simon's blood pressure was under control before he died. Thus, in both cases, the plaintiff was not ill, and was in fact healthy immediately prior to the occurrence resulting in death. Proof of a state of health prior to an injury with a following change is competent evidence to establish that the impaired condition was due to the trauma. (*Scholle*, at 722.) For

this reason, too, the decision in this case should have been left to the jury. To be consistent with the well-reasoned opinion in *Scholle*, I would reverse so that plaintiff can have a complete trial and a jury determination as to whether the forward movement of the car was accidental.