ARTHUR SVENSON, Plaintiff-Appellee, *v.* MILLER BUILDERS, INC., Defendant and Third-Party Plaintiff-Appellant.—(BROSIO & SON, INC., Third-Party Defendant-Appellee.)

First District (5th Division)  No. 78-63

■■■■■■■■■■

Opinion filed June 29, 1979.

Victor J. Piekarski, of Querrey, Harrow, Gulanick & Kennedy, Ltd., of Chicago, for appellant.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Leonel I. Hatch, D. Kendall Griffith, and Stephen R. Swofford, of counsel), for appellee Brosio & Son, Inc.

William J. Harte, Ltd., of Chicago, for appellee Arthur Svenson.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Defendant and third-party plaintiff (Miller) appeals from judgments in favor of plaintiff (Svenson) and third-party defendant (Brosio & Son) in an action brought under the Structural Work Act (Ill. Rev. Stat. 1977, ch. 48, par. 60 *et seq.*). On appeal, Miller contends that the verdicts, judgments and answers to the special interrogatory were contrary to law and against the manifest weight of the evidence and that the trial court erred in (1) allowing plaintiff to file an amended complaint at the conclusion of the evidence; (2) allowing certain improper questions; (3) failing to instruct the jury properly on Miller's theory of the case; and (4) failing to grant judgment in Miller's favor on count II of the third-party complaint.

The following facts are pertinent to this appeal.

Svenson initiated this action by filing a complaint against Miller alleging that he sustained injuries while employed as a bricklayer by

Brosio & Son. The complaint alleged violations of the Structural Work Act. Miller subsequently filed a third-party complaint against its subcontractor, Brosio & Son, alleging that the latter was responsible for any violations of the Structural Work Act. Miller also alleged that Brosio & Son had contractually agreed to indemnify and hold Miller harmless from any claim for injury or damage, but had failed to perform this condition.

The following pertinent evidence was adduced at trial.

*Robert J. Nielsen, Director of Administration, Miller Builders, under section 60*

On December 10, 1969, he was employed as operations manager of Miller's housing division and had an office on the premises of Miller's Northgate housing project. Miller was general contractor for the Northgate project. As of December 10, 1969, approximately 200 single-family homes had been constructed at the project. A total of 700 homes was planned. Miller had sublet portions of the work on the project to various subcontractors. Miller, as general contractor, was responsible for the scheduling and supervision of the entire project including the engagement and supervision of the subcontractors. He inspected the buildings on the project two or three times per week. Miller also had five other men on the job to supervise the subcontractors. The subcontractors were required to allow Miller to inspect their work. He had the authority to halt any unsafe practices on the project. He was aware that the Illinois Structural Work Act applied to the work being performed on the project.

The excavation and backfilling on the project was performed by Embico, a corporation wholly owned by Miller. Nielsen was an officer of Embico. Embico's responsibilities included excavating each building site and returning compactible soil against the completed concrete foundation of each building. He was not aware of any complaints regarding the level of the backfill, but was aware of complaints about the difficulty of compacting the frozen soil.

During his inspections he observed masonry scaffold used by Brosio & Son, plaintiff's employer and a subcontractor on the project. The masonry scaffold was portable and was erected on the backfill surrounding each building. The ground conditions would determine the footing or bearing to be placed under each scaffold. Where the underlying soil is loose or soft it is necessary to place bricks, lumber or plywood under the scaffold to prevent the scaffold from sinking into the ground. The height of a scaffold would generally determine whether it should be secured to the building. The purpose of securing a scaffold is to prevent it from "tipping over." He did not know whether the scaffold used by Brosio & Son was secured to anything.

The backfill at the Northgate project was "all clay" and came to within a foot of the top of the foundation. The masons normally began brick work on a house two weeks after completion of the backfill.

On direct examination he testified that he did not tell employees of Brosio & Son how to do their work.

### *Raymond Brosio, President of Brosio & Son, Inc., under Section 60*

He is a bricklayer. His company contracted with Miller sometime prior to December 10, 1969, to do certain brickwork on the Northgate project. It was the practice of Brosio & Son "to stack and scaffold a building" before the bricklayers began working.

On December 10, 1969, he, his brother Louis Brosio, and Svenson were working together on a tubular steel scaffold with four legs. The scaffold was erected by Albert Walker, a Brosio & Son employee. It was three tiers high, the third level being approximately 15 feet off the ground. There were bricks stacked on the second tier; he did not know whether there were any on the third tier. He did not know whether the soil under the scaffold was backfill of whether it was properly compacted. However, he admitted that in his deposition he had testified that the scaffold sunk because the backfill under the scaffold was not compacted.

The scaffold was placed on mud sills which are pieces of planking used to distribute the weight of the scaffold. The scaffold was not secured to the building in any way. After they had been working on the scaffold for about an hour one corner suddenly gave way and the bricks fell. A brick struck plaintiff. He and his brother attempted to aid plaintiff and called for an ambulance.

All of the scaffolding used by Brosio & Son was owned and maintained by Brosio & Son. He did not make any formal written complaints about the backfill to Miller prior to the accident.

### *Louis Brosio*

On December 10, 1969, he was vice-president of Brosio & Son and was working on the scaffold with Svenson on that date. The scaffold was about 20 to 25 feet high, contained four or five levels, and was placed along the south side of the building. The brick was stacked to about 15 feet. He did not recall whether the scaffold was braced or tied to the building, but stated that there was no need to secure it to the building. The custom in the construction industry was to brace the scaffold where "you are going extremely high" and where the ground was not solid. The scaffold was tied to other scaffolding which ran around the house and was also given vertical support by planking which connected it to the other scaffolding. The scaffold was built upon planking which had been placed over frozen backfill. As he, Svenson and Ray Brosio were working on the

scaffold "the ground gave away" and "it tipped." The scaffold did not fall over. When the scaffold tipped 10 or 12 bricks fell. He testified that if the backfill appeared to be getting soft as the weather warmed up, "we'd stop and fix it." The inspectors from Miller would inspect his company's work anywhere from one to six times a day.

On cross-examination he stated that the scaffold was level and in good shape when they began work. The scaffold was owned, constructed and used exclusively by Brosio & Son. If the backfill appeared inadequate, Brosio & Son would level it before erecting the scaffold. He admitted that the inspectors from Miller did not give him directions.

On redirect he stated that where scaffolding is tied to adjoining scaffolding there is no need to brace it to the building.

### William Fontana, Foreman, Brosio & Son, Inc., under section 60

At the time of Svenson's accident he was working on the inside of the same building. The scaffold on which Svenson was working was not tied to the building in any way. Scaffolding was only tied to the building when the bricklayer thought it necessary. In his opinion the scaffold would have "sunk on one end" even if it had been tied to the building. Nothing would prevent the scaffold from tipping if the backfill were to give way. He did not believe there was any way to prevent the accident.

The night before the accident it had rained "pretty hard." The ground was frozen at 8 a.m. on the morning of the accident, but "warmed up" soon thereafter. The scaffold tipped when one leg "gave way down into the backfill." Bricks were stacked on the second level of the scaffold, approximately 10 or 12 feet off the ground. The scaffold was not braced because "we didn't think it needed it." He admitted that Miller had nothing to do with erecting the scaffold.

### Arthur Svenson, on his own behalf

He had been employed as a bricklayer by Brosio & Son for approximately 13 months prior to the accident. Brosio & Son utilized a "pre-stacking" procedure whereby the laborers would build scaffolding around the entire building and stack all the necessary bricks on the scaffold. The bricklayers were not present during this procedure and were not involved with erecting or constructing the scaffold.

On the day of the accident he started working at 8 a.m. This was the first time he had seen the particular scaffold. It was approximately 25 or 30 feet in height and was not secured to the building in any way. The custom and practice in the bricklaying industry was to secure such a scaffold to the building in order to prevent tipping. Moreover, according to the custom and practice in the industry, bricks should never be stacked above chest height in order to prevent injury should the scaffold tip.

The scaffold upon which he was working was placed on top of a wooden plank. The plank rested upon the backfill. He was standing about three feet off the ground on a foot plank within the scaffold. He fell when the scaffold began to sink. Shortly thereafter he lost consciousness and later woke up in the hospital.

On one or two occasions prior to the accident he overheard Ray Brosio complain to someone about the "rough and sloppy" condition of the backfill. Ray Brosio told him later that this person was from Miller. He did not recall the dates of these complaints.

Svenson testified that his injuries resulting from the accident consisted of third nerve paralysis of one eye, soft tissue injuries to his neck and back and certain neurological disorders including dizziness.

On cross-examination Svenson stated that Ray Brosio was mistaken when he testified that no complaints were made to Miller about the condition of the backfill. Although the ground beneath the scaffold was frozen when he began working, it had thawed by approximately 10 a.m. In his opinion the scaffold sank when the ground thawed. He stated that prior to the accident he told Ray Brosio that the scaffold should be braced against the building to prevent tipping.

On redirect he testified that when he told Ray Brosio that the scaffold should be braced, Brosio told him, "something like, if you don't like it, you know what to do."

Following the trial, judgment on the verdict was entered in favor of Svenson and against Miller. Judgment on the verdict was also entered in favor of Brosio & Son and against Miller on count I of the third-party complaint. Subsequently the trial court granted summary judgment in favor of Brosio & Son on count II of the third-party complaint. Miller now appeals from denial of its post-trial motion.

OPINION

Miller first contends that the jury verdicts, judgments and answer to the special interrogatory are against the manifest weight of the evidence. Miller concedes that it was in charge of the work for purposes of section 9 of the Structural Work Act (Ill. Rev. Stat. 1977, ch. 48, par. 69) but argues that it was not guilty of any active violations of the Act.

In his amended complaint Svenson alleged that Miller had violated the Act in one or more of the following respects:

"(a) The scaffold in question was not adequately placed or secured so that it tipped or fell inwardly;

(b) the planks under the legs of the scaffold in question were placed upon backfill which was inadequately compacted;

(c) the scaffold was stacked with bricks over the heads of the

plaintiff and other bricklayers as they were performing their work."

The jury returned a general verdict in favor of Svenson, but did not specify the violation or violations upon which the verdict was based. Miller does not contend that the failure to provide adequate backfill would not constitute a violation of the Act. It does argue, however, that the evidence adduced at trial was insufficient to support a finding that the backfill was inadequate. A jury verdict based upon inadequate backfill, Miller argues, would be against the manifest weight of the evidence.

■■ We will affirm a jury verdict unless it is contrary to the manifest weight of the evidence. (*Haag Brothers, Inc. v. Artex International, Inc.* (1978), 60 Ill. App. 3d 141, 376 N.E.2d 636.) Verdicts and judgments are considered against the manifest weight of the evidence only when an opposite conclusion is clearly evident or the jury's verdict is palpably erroneous. (*Didier v. Jones* (1978), 61 Ill. App. 3d 22, 377 N.E.2d 572.) Manifest weight is that weight which is clearly evident, plain and indisputable. (*Haas v. Woodward* (1965), 61 Ill. App. 2d 378, 209 N.E.2d 864.) Moreover, it is clearly the function of the jury to resolve controverted issues of fact. *Ruggiero v. Public Taxi Service, Inc.* (1973), 16 Ill. App. 3d 754, 306 N.E.2d 567.

■■ ■ We do not agree with Miller's contention that the evidence was insufficient to support a finding that the backfill was inadequate. Louis Brosio, who was on the scaffold with Svenson at the time of the accident, testified that "the ground gave way" and the scaffold "tipped." William Fontana, who was also present at the scene, testified that although it was frozen at 8 a.m. the ground warmed up soon thereafter. He testified that one leg of the scaffold sank into the backfill, causing the scaffold to tip. Svenson testified that before falling he felt the scaffold "sagging." Although the jury did not specify the violation or violations of the Structural Work Act, we believe there is sufficient clear and competent evidence in the record to support a finding that the backfill was inadequate. Accordingly, the verdict and judgment against Miller on Svenson's complaint is consistent with the manifest weight of the evidence.

Miller next contends that the verdict and judgment in favor of Brosio on Miller's third-party complaint for implied indemnity is against the manifest weight of the evidence. Miller argues that it was guilty of only passive violations of the Structural Work Act while Brosio & Son was guilty of active violations. Miller therefore asserts that it was entitled to indemnity from Brosio & Son.

■■■■ Our supreme court has held that there are degrees of fault under the Structural Work Act and that "the lesser delinquent, if held accountable

by the plaintiff, can transfer its statutory liability to the active delinquent, whose dereliction from duty brought about the plaintiff's injury." (*Miller v. DeWitt* (1967), 37 Ill. 2d 273, 291-92, 226 N.E.2d 630, 642.) The distinction between the conduct of parties liable under the Structural Work Act can be best described in terms of the indemnitor being guilty of active misconduct and the indemnitee being guilty of passive misconduct. (See *Warren v. Johnson & Johnson* (1976), 39 Ill. App. 3d 1029, 351 N.E.2d 415.) Where indemnity is based upon an active-passive distinction, the conduct of the indemnitor must be primary or active while that of the indemnitee must be secondary or passive. (*Burgdorff v. International Business Machines* (1975), 35 Ill. App. 3d 192, 341 N.E.2d 122.) The distinction between active and passive misconduct involves a weighing of the relative faults of each party. (*Gulf, Mobile & Ohio R.R. Co. v. Arthur Dixon Transfer Co.* (1951), 343 Ill. App. 148, 98 N.E.2d 783.) In order to be entitled to indemnity, a party's conduct must be considered as only secondarily contributing to the injury and it must appear that the party did not breach an affirmative duty owed to the plaintiff. (*Warzynski v. Village of Dolton* (1974), 23 Ill. App. 3d 50, 317 N.E.2d 694, *rev'd on other grounds* (1975), 61 Ill. 2d 475, 338 N.E.2d 25.) The jury in the instant case, in answer to a special interrogatory, stated that Miller's misconduct was "active." We will affirm the jury's answer to a special interrogatory unless contrary to the manifest weight of the evidence. *Klein v. Pritikin* (1972), 6 Ill. App. 3d 323, 285 N.E.2d 457.

■■ We do not believe Miller is entitled to implied indemnity under facts presented here. Miller, through its wholly owned subsidiary Embico, had full responsibility for the compaction of the backfill. Although Miller had an affirmative duty to provide backfill adequate to support the scaffold, there is sufficient evidence in the record to establish Miller's failure to do so. Miller's failure with regard to the·backfill cannot be characterized as merely passive or secondary. Rather, Miller's conduct was active or primary. As an active tortfeasor, Miller was not entitled to implied indemnity regardless of the conduct of Brosio & Son. See *Carver v. Grossman* (1973), 55 Ill. 2d 507, 305 N.E.2d 161.

Miller further contends that the trial court erred in allowing Svenson to file an amended complaint at the conclusion of the evidence.

Section 46(3) of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 46(3)) provides that:

> "A pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs* * *."

The allowance of amendments following the presentation of evidence rests within the sound discretion of the trial court and the ruling of the trial court will not be disturbed absent a clear case of abuse. (*Powers v. Sturm* (1973), 12 Ill. App. 3d 346, 297 N.E.2d 628.) To the end

that justice may be done, courts are liberal in allowing amendment of pleadings to conform to the proof. (*McCartney v. McCartney* (1956), 8 Ill. 2d 494, 134 N.E.2d 789; *Powers v. Sturm.*) The most important consideration is the furtherance of justice. *Blazina v. Blazina* (1976), 42 Ill. App. 3d 159, 356 N.E.2d 164.

The original complaint charged that Miller violated the Structural Work Act as follows:

"(a) by failing to provide a safe, suitable and proper scaffold;

(b) by permitting the erection of a scaffold in an unsafe, unsuitable and improper manner;

(c) by permitting the erection of a scaffold in such a manner so that proper and adequate protection was not provided the plaintiff;

(d) by permitting the use of a scaffold which was erected in violation of the provisions of safety codes, rules and statutes made and provided therefor;

(e) by otherwise violating or permitting the violation of the provisions of the Structural Work Act of Illinois."

After the presentation of evidence the trial court allowed Svenson to file an amended complaint alleging certain violations of the Structural Work Act as hereinbefore set forth.

■■ We do not believe the trial court abused its discretion in allowing Svenson to file the amended complaint. The original complaint alleged general violations of the Structural Work Act without specifying the manner in which the scaffold was unsafe. The evidence adduced at trial supported an allegation of inadequate backfill. We fail to see any unjust surprise or prejudice to Miller resulting from the trial court's allowance of the amendment following presentation of the evidence.

Miller next contends that the trial court erred in allowing counsel for Svenson to question Robert Nielsen regarding Miller's legal duty to Svenson. During cross-examination of Nielsen, the following exchange occurred:

"SVENSON'S COUNSEL: The Illinois Structural Work Act applied to the work being done on the job at that time and place, isn't that right?

❋  ❋  ❋

MR. NIELSEN: Yes.

❋  ❋  ❋

SVENSON'S COUNSEL: You mean [that] to see that scaffolding is safe and suitable and proper is outside the scope of the general contractor?

❋  ❋  ❋

MR. NIELSEN: The scaffolding that belongs to a subcontractor is erected and maintained and utilized at his direction. The scope

of the general contractor, especially as it's interpreted by Miller Builders, is to utilize the subcontractor to build the house. We assume normal working conditions and normal practices.

❅  ❅  ❅

SVENSON'S COUNSEL: Are you saying that it's Miller Builders' concept of its obligation as a general contractor that it need not insure the scaffolding on these projects as safe, suitable, and proper?

❅  ❅  ❅

MR. NIELSEN: Miller Builders' concept or philosophy of construction, if you like that better, is that in selecting a qualified subcontractor we assume he knows how to do his job and has performed it satisfactorily in the past. And since we do not limit, in the terms of our contract, the specific time of day, night or weekend that the work would be completed, it is completely possible that the subcontractor could perform the work when there is no representative of Miller Builders on the site. So in that regard we really don't have total control over the performance of the work but only the quality and the results."

■■ It is clear that neither an expert nor a nonexpert witness may give an opinion on an ultimate issue in the case. (*Gillette v. City of Chicago* (1947), 396 Ill. 619, 72 N.E.2d 326.) The question of whether or not Miller had an obligation or duty to provide a safe, suitable and proper scaffold for Svenson was for the jury's ultimate determination. The trial court therefore erred in allowing counsel for Svenson to question Nielsen regarding Miller's legal duty under the Structural Work Act.

■■ However, it is well established that we will not reverse a decision unless the appellant can show that the error was probably prejudicial to his case. (*Gale v. Hoekstra* (1978), 59 Ill. App. 3d 400, 375 N.E.2d 456.) Although the questions and answers here were improper, we do not believe that the error was sufficiently harmful to require a reversal. (See *Wawryszyn v. Illinois Central R.R. Co.* (1956), 10 Ill. App. 2d 394, 135 N.E.2d 154.) These isolated questions and answers cannot be said to have confused or misled the jury or to have prejudiced Miller's case in any way.

Miller next contends that the trial court erred in admitting Svenson's testimony regarding complaints about the backfill which Ray Brosio allegedly made to an unidentified employee of Miller. Svenson testified that on two occasions prior to the accident he heard Ray Brosio tell someone that the backfill was "rough and sloppy." Svenson further testified that he was told by Brosio that the man was a Miller employee. Svenson could not recall the name of the Miller employee nor the dates of the complaints. Brosio himself denied making any formal complaints to Miller regarding the backfill.

■■ Miller argues that the testimony was irrelevant. Relevancy is established where the offered evidence tends to prove a fact in controversy or renders a matter at issue more or less probable. (*Marut v. Costello* (1966), 34 Ill. 2d 125, 214 N.E.2d 768.) In determining relevancy we must consider the evidence in light of the factual issues raised in the case. (See *Simon v. Lumbermens Mutual Casualty Co.* (1977), 53 Ill. App. 3d 380, 368 N.E.2d 344.) In the instant case the condition of the backfill and Miller's responsibility for that condition were clearly at issue. The testimony of Svenson logically tended to establish Miller's awareness of the certain problems with the backfill. Such testimony cannot be said to be irrelevant to the issues of this case.

■■ ■ Miller also argues that this testimony constituted hearsay and denied Miller an opportunity for proper cross-examination regarding the alleged complaints. It is clear that a specific objection to evidence is a waiver of all points not specified. (*Forest Preserve District v. Lehmann Estate, Inc.* (1944), 388 Ill. 416, 58 N.E.2d 538.) The purpose of this rule is to inform the trial court of the particular problem and to enable the party offering the testimony an opportunity to confront the objection. (*Kapelski v. Alton & Southern R.R.* (1976), 36 Ill. App. 3d 37, 343 N.E.2d 207.) Moreover, even hearsay evidence, if received without objection on that ground, will be admitted and given its natural probative weight. (*Town of Cicero v. Industrial Com.* (1949), 404 Ill. 487, 89 N.E.2d 354.) In the instant case, Miller's objection at trial was clearly based upon relevancy. Miller cannot now raise objections not urged at trial.

■■ Moreover, we note that the hearsay rule is based upon the right to cross-examine the declarant. (*Grand Liquor Co. v. Department of Revenue* (1977), 67 Ill. 2d 195, 367 N.E.2d 1238.) Where the declarant is present in court and available for cross-examination the purpose of the hearsay rule is satisfied. (See *People v. Townsend* (1977), 47 Ill. App. 3d 789, 365 N.E.2d 110; *Breslin v. Bates* (1973), 14 Ill. App. 3d 941, 303 N.E.2d 807.) Here, Ray Brosio, the alleged out-of-court declarant, did in fact testify and was cross-examined at trial, thus satisfying the purpose of the hearsay rule. Although Brosio denied making any formal complaints, it is clear that the credibility of a witness is a matter for the jury to consider. *Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 356 N.E.2d 32.

Miller next contends that the trial court erred in refusing to instruct the jury with regard to active-passive misconduct. Specifically, Miller objects to the trial court's failure to accept Miller's Instruction No. 12, which stated:

> "Active violation of The Structural Work Act means participation in causing an injury to the plaintiff, Arthur Svenson.
> Passive violation of The Structural Work Act means any other violation of the Act."

Although the trial court refused to give Miller's Instruction No. 12, it did give Miller's Instruction No. 15. The latter instruction was clearly offered by Miller as an alternative to No. 12 and stated:

"You are instructed that the word 'active' means action and is the opposite of passive; and the word 'passive' means inactive, consisting of endurance or submission rather than action."

■■ It is clear that the refusal of an instruction adequately covered by another instruction does not constitute error. (*Makas v. Pagone* (1972), 6 Ill. App. 3d 532, 285 N.E.2d 812; *Prowell v. Twin Mills Lumber Corp.* (1967), 79 Ill. App. 2d 401, 223 N.E.2d 749.) The instruction given by the trial court here accurately defined the terms active and passive. (See *Gerlach v. Pepper Construction Co.* (1971), 2 Ill. App. 3d 169, 276 N.E.2d 22.) Accordingly, the trial court did not err in refusing to give Miller's Instruction No. 12.

With regard to Miller's various allegations of trial error, we note that our review is not to determine whether the record is totally free of error. Rather we must determine whether any error occurred which prejudiced appellant or affected the outcome of the trial. (*Chloupek v. Jordan* (1977), 49 Ill. App. 3d 809, 364 N.E.2d 650.) We have carefully reviewed the entire record and have found no error sufficient to require reversal.

Miller finally contends that the trial court erred in failing to grant summary judgment in its favor on count II of the third-party complaint. In count II Miller alleged that the agreement between Miller and Brosio & Son required Brosio & Son to carry liability insurance to "hold the builders and his agent, harmless from any claims for injury and damage, and shall be with a company satisfactory to the builder." Miller alleged that Brosio & Son breached the agreement by failing to include Miller as a named insured. Brosio & Son argues that the agreement did not require that Brosio & Son provide insurance coverage for Miller's own acts of misconduct.

■■ In *Westinghouse Electric Elevator Co. v. LaSalle Monroe Building Corp.* (1946), 395 Ill. 429, 433, 70 N.E.2d 604, 607, our supreme court stated:

"It is quite generally held that an indemnity contract will not be construed as indemnifying one against his own negligence, unless such a construction is required by clear and explicit language of the contract, [citations] or such intention is expressed in unequivocal terms."

■■ The interpretation of any indemnity agreement depends upon the particular language of the agreement and the factual setting of the case. (*Zadak v. Cannon* (1974), 59 Ill. 2d 118, 319 N.E.2d 469.) Although the instant case involves an agreement to procure insurance rather than to provide direct indemnity, we believe the general rule as adopted in

*Westinghouse* remains applicable. Here the agreement does not explicitly require that Brosio & Son provide insurance covering Miller's own acts of negligence or misconduct and no such requirement can be inferred from the facts of the case. In the absence of factors clearly indicating otherwise, we will not presume that Brosio & Son agreed to provide insurance to protect Miller from the consequences of its own actions. To hold otherwise would violate the public policy of this State as set forth in *Westinghouse* and its progeny.

For the foregoing reasons the judgment of the circuit court is affirmed.

Affirmed.

MEJDA and WILSON, JJ., concur.