# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Lough v. BNSF Ry. Co.*, 2013 IL App (3d) 120305

---

| | |
|---|---|
| Appellate Court Caption | CHARLES LOUGH, Independent Executor of the Estate of Kenneth Lough, Deceased, Plaintiff-Appellant, v. BNSF RAILWAY COMPANY and LEO J. JOERGER, Defendants-Appellees. |
| District & No. | Third District<br>Docket No. 3-12-0305 |
| Rule 23 Order filed<br>Motion to publish<br>allowed<br>Opinion filed | March 25, 2013<br><br>May 3, 2013<br>May 3, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Summary judgment was properly entered for defendants in a wrongful death action arising from the death of plaintiff's father 22 months after he was involved in an automobile accident with defendant, since there was no evidence supporting plaintiff's reliance on the "eggshell plaintiff doctrine" that the accident caused or aggravated the deceased's congestive heart failure from COPD/emphysema, the afflictions listed on his death certificate as the cause of his death. |
| Decision Under Review | Appeal from the Circuit Court of Bureau County, No. 09-L-40; the Hon. Marc P. Bernabei, Judge, presiding. |
| Judgment | Affirmed and remanded. |

Counsel on
Appeal

James R. Angel (argued), of May, May, Angel & Harris, of Princeton, for appellant.

Craig L. Unrath, Stephen J. Heine, and Patrick P. Poston, all of Heyl, Royster, Voelker & Allen, of Peoria, and Tamara K. Hackmann (argued), of Heyl, Royster, Voelker & Allen, of Urbana, for appellees.

Panel

JUSTICE SCHMIDT delivered the judgment of the court, with opinion.

Justices Lytton and McDade concurred in the judgment and opinion.

## OPINION

¶ 1 Defendant Leo Joerger drove a vehicle during the course of his employment with defendant BNSF Railway Company which collided with a vehicle driven by Kenneth Lough. Kenneth died 22 months after the accident. This appeal involves the dismissal of two wrongful death counts brought by plaintiff, Charles Lough, as the independent executor of the estate of Kenneth Lough, against defendants. The circuit court of Bureau County granted defendants' joint motion for summary judgment, thereby dismissing the wrongful death counts. Plaintiff appeals, claiming evidence of causation exists sufficient to withstand defendants' motion for summary judgment.

¶ 2                              BACKGROUND

¶ 3 The automobile accident at issue in this matter took place on October 19, 2007. As noted above, it involved vehicles driven by Kenneth Lough and defendant Leo Joerger.

¶ 4 Kenneth Lough was born July 29, 1938. Dr. Martin Faber, Kenneth's primary physician, began treating him in July of 1979. In December of 1978, Kenneth was involved in a snowplow accident, which either caused or contributed to significant neck problems. At the time of Kenneth's first visit to Dr. Faber in 1979, Kenneth already suffered from the onset of chronic obstructive pulmonary disease (COPD), which was likely caused by smoking, a genetic disease or chemical exposure.

¶ 5 Dr. Faber testified in his deposition that at some point in time, Kenneth developed severe depression from which he never truly recovered. Kenneth had been treated for depression as of March of 1985. Kenneth's COPD progressed from 1979 until the time of his death. Dr. Faber noted it was "unrelenting in its severity."

¶ 6 A physical examination in 1979 indicated that Kenneth had right neuroforaminal changes at C5-C6; X-rays taken in 1986 disclosed moderate to marked degenerative changes at multiple levels in his spine, including his neck. Kenneth's depression became "unrelenting"

after the death of his wife in 1993. In 1992, Kenneth complained of memory changes. Kenneth had difficulty driving and would routinely get lost when leaving the house. He also forgot names of his children and friends.

¶ 7 Dr. Faber noted that in 1997, Kenneth continued to have severe arthritis problems in his neck and back, which did not resolve prior to his death. Dr. Faber diagnosed Kenneth with "failed low back symptoms" in 2004, which meant that his pain was chronic and unresponsive to surgical or pharmacological remedies. Dr. Faber stated that the health problems Kenneth suffered from prior to the accident were related to a combination of smoking, occupational circumstances, lifestyle, injury and hereditary changes. Prior to the accident, Kenneth's prescriptions included OxyContin for pain, alazopram for depression and sleeping troubles, and inhalers for his COPD.

¶ 8 Dr. Faber stated that given Kenneth's preaccident condition, he was susceptible to increased injury beyond a healthy individual. Any trauma would likely result in greater pain, immobility and inactivity. Dr. Faber noted that a patient who is immobilized and experiencing Kenneth's level of neck and back pain would have problems coughing, leading to difficulty fighting off pneumonia.

¶ 9 Records indicate that Kenneth was taken to Perry Memorial Hospital after the accident. Magnetic resonance imagings (MRIs) that were taken at Perry Memorial showed no acute traumatic abnormality in Kenneth's neck or back following the accident.

¶ 10 When asked about this accident of October 19, 2007, Dr. Faber testified that he "would have a difficult time connecting that particular motor vehicle accident after 22 months with the patient's death." Defense counsel asked Dr. Faber, "Is it more probably true than not in your opinion that there is no connection between the car accident and the man's death?" Dr. Faber replied, "I would have to concur with that." Dr. Faber last examined Kenneth on July 16, 2009, almost one month prior to his death.

¶ 11 Kenneth's son, Chuck, testified that prior to the accident, his father rode motorcycles, hunted with friends, drove around the country, went to breakfast, mowed the lawn and worked in the garden. Chuck noted that on the day of the accident, Chuck called Kenneth, who stated he had just been in an accident. Chuck arrived at the hospital to see Kenneth being removed from an ambulance. Kenneth complained of being sore at the emergency room, where he was treated with shots of pain medicine before being released home.

¶ 12 Chuck noted that Kenneth's condition became worse after the accident. Kenneth did not wish to leave the house or engage in other activities. Chuck believed his father became more depressed after the accident. Prior to his death, Kenneth was in the hospital on several occasions for pneumonia.

¶ 13 Dr. Faber referred Kenneth to a pain management doctor, Ronald Kloc, in January of 2008, four months postaccident. Dr. Kloc reviewed X-rays and found no acute traumatic abnormality, but noted degenerative disc disease, facet joint arthritis and inflammation in the sacroiliac joint. Kenneth relayed to Dr. Kloc that prior to the accident, he rode motorcycles or snowmobiles but was unable to afterwards. Kenneth further informed Dr. Kloc that his pain was much worse after the accident. Dr. Kloc diagnosed Kenneth with degenerative disc disease of the cervical spine, facet joint arthritis and sacroilitis. Dr. Kloc noted that COPD

is the chronic deterioration of the stroma in the lung tissue, which must be thin and clear enough to allow for oxygen exchange. A patient who suffers from COPD experiences inadequate oxygen exchange, which requires the heart to pump harder, eventually leading to heart failure.

¶ 14       Dr. Kloc noted it was difficult to determine how much of Kenneth's pain came from the 1978 accident as opposed to the 2007 accident. He concluded that Kenneth's pain became worse after the 2007 accident, noting that increasing age obviously played a significant role in the increased pain. Dr. Kloc testified that he had no quarrel with the cause of death stated on Kenneth's death certificate and no other opinion as to any other suspected causes of death. Dr. Kloc agreed that Kenneth did not die due to any of the degenerative problems he had throughout his spine or due to the 1978 or 2007 car accident. Dr. Kloc could not quantify the extent to which the 2007 accident impacted Kenneth's degenerative condition, noting "it's anybody's guess as to how exactly much more it hurt him" and "it's hard to quantify with a specific number."

¶ 15       On April 14, 2008, Kenneth presented to the Princeton Hospital emergency room complaining of weakness and frequent falls. Dr. Rick Cernovich found Kenneth had an irregular heart rhythm consistent with a history of chronic atrial fibrillation. Dr. Cernovich had no opinion that Kenneth's complaints of light-headedness in the emergency room were related to any car accident.

¶ 16       Kenneth died on August 11, 2009. The cause of death on his death certificate indicates congestive heart failure, with an onset of two months, secondary to COPD/emphysema three months. No autopsy was performed.

¶ 17       Plaintiff's complaint contains four counts. Counts I and II allege wrongful death pursuant to the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 2010)). Counts III and IV sounded in negligence and were brought pursuant to section 27-6 of the Probate Act of 1975, commonly referred to as the Survival Act (755 ILCS 5/27-6 (West 2010)). Defendants moved for summary judgment on counts I and II, claiming the plaintiff failed to adduce sufficient evidence establishing that their actions were a proximate cause of Kenneth's death. The trial court agreed and granted defendants' motion for summary judgment. The trial court included language in the order dismissing counts I and II pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010), finding there was no just reason to delay enforcement or appeal of the order. The survival actions contained in counts III and IV remain pending in the circuit court. This appeal followed.

¶ 18                                              ANALYSIS

¶ 19       We review an order granting summary judgment *de novo*. *Schultz v. Illinois Farmers Insurance Co.*, 237 Ill. 2d 391 (2010). Summary judgment motions are governed by section 2-1005 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1005 (West 2010)). Pursuant to that section, summary judgment should be granted only where the pleadings, depositions, admissions and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is clearly entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2010). "If the

plaintiff fails to establish any element of the cause of action, summary judgment for the defendant is proper." *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008).

¶ 20    To state a cause of action under the Wrongful Death Act (the Act), a plaintiff must show that: (1) defendant owed a duty to the deceased; (2) defendant breached the duty; (3) the breach proximately caused the decedent's death; and (4) monetary damages resulted to persons designated under the Act. 740 ILCS 180/1 (West 2010); *Bovan v. American Family Life Insurance Co.*, 386 Ill. App. 3d 933 (2008). "The traditional statement of proximate cause requires plaintiff to prove that defendant's negligence 'more probably than not' caused plaintiff's injury." *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 107 (1997).

¶ 21    The term "proximate cause" describes two distinct requirements: cause in fact and legal cause. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455 (1992). "[L]iability cannot be premised merely upon surmise or conjecture as to the cause of the injury." *Id.* "Cause in fact concerns whether the defendant's conduct is a material factor in bringing about the injury." *Majetich v. P.T. Ferro Construction Co.*, 389 Ill. App. 3d 220, 224 (2009). "A defendant's conduct is a material factor in bringing about the injury if, absent the conduct, the injury would not have occurred." *Id.* "Legal cause deals with a question of foreseeability." *Id.* "Absent affirmative and positive evidence that defendant proximately caused plaintiff's injuries, a plaintiff fails to establish the existence of a genuine issue of material fact." *Id.*

¶ 22    Plaintiff contends this is a classic "eggshell" plaintiff case. That is, this accident resulted "in bringing a dormant disease or condition into activity" and, as such, the accident rather than the disease is the proximate cause of the injury. Defendants disagree, claiming that the plaintiff failed to adduce any credible evidence suggesting this accident proximately caused Kenneth's death. Defendants not only argue that plaintiff failed to adduce evidence suggesting that this accident proximately caused Kenneth's death, but that Kenneth's own physician affirmatively testified that the accident did not cause or contribute to Kenneth's death.

¶ 23    Again, when asked about this accident of October 19, 2007, Dr. Faber testified that he "would have a difficult time connecting that particular motor vehicle accident after 22 months with the patient's death." Defense counsel asked Dr. Faber, "Is it more probably true than not in your opinion that there is no connection between the car accident and the man's death?" Dr. Faber replied, "I would have to concur with that."

¶ 24    "Our courts have held that there should be no recovery where there has been a failure to prove a causal connection between the injury and the event at issue." *Manion v. Brant Oil Co.*, 85 Ill. App. 2d 129, 136 (1967). Evidence of proximate cause "must not be contingent, speculative or merely possible, but that there must be such degree of probability as to amount to a reasonable certainty that such causal connection exists." *Id.* Liability "cannot be predicated upon speculation, surmise, or conjecture as to the cause of the injuries." *Schultz v. Hennessy Industries, Inc.*, 222 Ill. App. 3d 532, 540 (1991). "Proximate cause can only be established when there is a reasonable certainty that the defendant's acts caused the injury." *Id.*

¶ 25    *Simon v. Lumbermens Mutual Casualty Co.*, 53 Ill. App. 3d 380 (1977), involved a dispute between a widow and her decedent husband's insurance carrier. The defendant issued

two policies of insurance to the decedent, which paid for bodily injury sustained while driving or riding in a private passenger automobile. *Id.* On the day of his death, the decedent and his wife attended a funeral after which the decedent went to his car, which was second in a long line of cars while his wife went to another car. *Id.* at 381. Witnesses observed the car decedent was driving lurch forward, striking the first car in line and pushing it approximately 15 feet. *Id.* After witnessing this, one person rushed to decedent's car, finding the decedent "gasping for air," "gagging and his eyes were bulging *** sort of rolling." (Internal quotation marks omitted.) *Id.* The decedent's color was yellowish and there was no blood or marks of trauma on the decedent. *Id.* The decedent's car sustained minimal damage from the collision. *Id.* The decedent passed away the same day. *Id.* at 382.

¶ 26    Prior to the incident at the funeral, the decedent had treated for 1½ years with Dr. Goldt for high blood pressure. *Id.* Dr. Goldt signed decedent's death certificate indicating the cause of death was acute coronary thrombosis. *Id.* During his evidence deposition, Dr. Goldt testified that " 'the coronary could have been caused by the trauma.' " *Id.* Dr. Goldt further stated that the accident " 'or hypertensive disease' " led to the coronary. *Id.* When asked, " 'is there any way for you to tell on the basis of that whether the accident caused the heart attack or the heart attack caused the accident?' " Dr. Goldt replied, " 'I would have to say no.' " *Id.* at 383.

¶ 27    In addition to Dr. Goldt's testimony, the *Simon* plaintiff offered testimony of the decedent's wife and bystanders at the funeral who testified to the decedent's appearance of health prior to the accident. *Id.* at 381. Nevertheless, at the close of the plaintiff's case-in-chief, the trial court struck Goldt's testimony and directed a verdict for defendant. *Id.* at 383.

¶ 28    In affirming the trial court's decision, the *Simon* court noted that Goldt's testimony could not be considered by the jury to establish causation as it was speculative and based upon conjecture. *Id.* at 384. The *Simon* court noted that without "Dr. Goldt's testimony there is insufficient evidence in the record for the case to be submitted to the jury to determine that the death was proximately caused by the accident. The jury could only speculate as to whether or not the accident had anything to do with the cause of death." *Id.* at 387.

¶ 29    We find *Simon* instructive. The argument for affirmation is even stronger in the case at bar than it was in *Simon* as Dr. Goldt testified that the " 'coronary could have been caused by the trauma.' " *Id.* at 382. Dr. Faber offered testimony that there was "no connection" between the automobile accident in this matter and decedent's death. Again, Dr. Faber concurred with the assertion that it is "more probably true than not *** that there is no connection between the car accident and the man's death." Dr. Kloc testified that he had no quarrel with the cause of death as stated on Kenneth's death certificate and no other opinion as to any other suspected causes of death.

¶ 30    Plaintiff argues he offered sufficient evidence to allow a jury to consider the causal connection between the automobile accident and decedent's death. Plaintiff initially claims the decedent was a "thin-skull" or "eggshell" plaintiff as described by the "eggshell plaintiff doctrine." Plaintiff argues "where an accident results in bringing a dormant disease or condition into activity, the accident, rather than the disease is the proximate cause of the injury." However, plaintiff offered no evidence to support this theory.

¶ 31     Plaintiff then cites to *People v. Amigon*, 239 Ill. 2d 71 (2010), to support his "eggshell plaintiff" theory claiming, "The Illinois Supreme Court has addressed the causation issue *** in a case with facts strikingly similar" to the one at bar. Our review of *Amigon* indicates it could not be more dissimilar to the case at bar. In *Amigon*, the defendant shot Alfonso Ruiz "causing a spinal cord injury and paralyzing him from the neck down, leaving him capable of moving only his head and biceps." *Id.* at 74. Approximately 5½ years after the shooting, Ruiz was hospitalized with pneumonia and later died. *Id.* The State charged and convicted the *Amigon* defendant with Ruiz's murder. *Id.* at 75.

¶ 32     The *Amigon* defendant argued the State failed to adduce sufficient evidence proving he was the legal cause of Ruiz's death. *Id.* at 77. Our supreme court disagreed, noting an assistant medical examiner testified "within a reasonable degree of medical and scientific certainty, that Ruiz's death was a homicide because a gunshot wound caused the quadriplegia that made him more susceptible to pneumonia." *Id.* at 76.

¶ 33     There is no evidence suggesting this automobile accident caused or aggravated Kenneth's congestive heart failure or COPD/emphysema. There is nothing in the *Amigon* decision to suggest that the decedent therein was anything but a healthy individual prior to being shot. Expert testimony in *Amigon* firmly established that the shooting caused quadriplegia, which, in turn, made the *Amigon* decedent more susceptible to pneumonia. The same quantum of expert evidence is simply not present in this case. We disagree with plaintiff's assertion that the testimony in *Amigon* is "very similar" to "Dr. Faber's later testimony that Mr. Lough's injuries from the accident and pre-existing neck and back conditions made him less able to fight his COPD and pneumonia, which eventually led to the fatal heart failure." Dr. Faber specifically agreed with the statement that there "is no connection between the car accident" and Mr. Lough's death.

¶ 34     Finally, plaintiff claims the trial court improperly required "direct causation testimony," thereby impermissibly foreclosing the possibility that plaintiff proffered sufficient circumstantial evidence of causation to create a genuine issue of material fact. Citing to *McCullough v. Gallaher & Speck*, 254 Ill. App. 3d 941 (1993), plaintiff notes, " 'Proximate cause can be sufficiently established by circumstantial evidence when an inference may reasonably be drawn from it.' " *Id.* at 949. This court acknowledged that principle in *Majetich v. P.T. Ferro Construction Co.*, 389 Ill. App. 3d 220. We further stated, however, that when a "plaintiff relies upon circumstantial evidence to establish proximate cause to defeat a motion for summary judgment, the circumstantial evidence must be of such a nature and so related as to make the conclusion more probable as opposed to merely possible." *Id.* at 225.

¶ 35     No evidence exists in the record on appeal to support the conclusion that the accident "more probably than not" contributed to decedent's death. Dr. Faber specifically testified that the two incidents were not related. Dr. Kloc testified that it would be impossible to quantify how much, if any, additional pain Kenneth suffered at the time of his death from this accident. Plaintiff proffered no testimony suggesting that an automobile accident can cause congestive heart failure or COPD/emphysema, the causes of death listed on Kenneth's death certificate.

¶ 36                                        CONCLUSION

¶ 37        For the foregoing reasons, the judgment of the circuit court of Bureau County is affirmed
and the cause is remanded for further proceedings on the remaining counts.

¶ 38        Affirmed and remanded.