LARRY FLAUGHER, Plaintiff-Appellee, *v.* SEARS, ROEBUCK & COMPANY *et al.*, Defendants-Appellants.

Fifth District   No. 77-415

Opinion filed June 30, 1978.

Wagner, Bertrand, Bauman & Schmieder, of Belleville, for appellants.

James P. Stiehl, of Belleville, for appellee.

Mr. JUSTICE KARNS delivered the opinion of the court:

This is an appeal by Sears, Roebuck & Company and Emerson Electric Company from a judgment of the Circuit Court of St. Clair County in behalf of plaintiff, Larry Flaugher, in his action for personal injuries. The action was based solely on the alleged negligence of the defendants in the design of a safety guard on a table saw purchased by the plaintiff. The jury returned a verdict of $32,500 in favor of the plaintiff against both defendants.

Defendants raise several questions on this appeal: whether the trial court erred in denying its motions for summary judgment, directed verdict and for judgment *n.o.v.*; whether the plaintiff was contributorily negligent as a matter of law; and whether the court improperly instructed the jury on the issue of causation. Because we have concluded that the defendant's conduct was not negligent, we need only reach the first of these issues.

In 1971, the plaintiff purchased from Sears, Roebuck & Company a Craftsman Bench Saw which had been designed and manufactured for Sears by Emerson Electric Company. The saw is a stationary table saw used primarily to cut wood and plastic materials. It is equipped with a rip fence, a 10-inch circular blade, and a spring-loaded safety guard assembly which fastens into place by a pin in the back of the device. The safety guard assembly contains a steel splitter or spreader which serves to prevent wood chips from pinching the blade by keeping the material spread apart. The splitter has two steel members positioned on either side of the blade each having sharp points that dig into the workpiece as the blade rotates toward the operator in order to prevent the wood from being kicked back towards him. The safety guard on the saw is made of transparent plastic and covers the exposed blade at all times, except when

material is being cut at which time it rides up and on the workpiece being fed into the saw.

On July 1, 1973, the plaintiff was operating the saw, located in the basement of his home, while constructing kitchen cabinets in his capacity as a finish carpenter for a local construction company. He was feeding a 4' x 2' x ½" piece of plywood into the saw and was approximately 5 inches from completing the cut when the wood met resistance. At this point his right hand was on the end of the piece of wood, positioned between the rip fence and the blade. As the wood bound up the plaintiff applied more forward and downward pressure. His right hand was approximately 5 inches from the blade as he gave the piece a final push when his right hand slipped off of the wood, under the guard, and into the blade resulting in the partial loss of several of his fingers.

The plaintiff testified that his experience with table saws dated back to his high school years. He stated that he was familiar with all the fundamentals of safety as they applied to the operation of table saws and that he had read the operator's manual, which included safety rules, that had accompanied the saw in order to assemble it. According to the plaintiff, he had been using the table saw for approximately 1½ years without any difficulty and was aware of how the safety shield functioned. He stated that the head of the rip fence had a crack in it when he purchased the saw and that the head had fallen off prior to the accident. The plaintiff stated that at the time of the accident the top of the saw blade was two inches above the top of the table and acknowledged that the blade should have been adjusted to a height of ⅝", or just a fraction higher than the ½" thick plywood piece. In cross-examination he testified that he was aware that when a piece of wood was being sawed it would cause the safety guard to rise up onto the object and then fall back down onto the table top after the cut was approximately half way completed.

Larry Stackhouse, senior design engineer for Emerson Electric Company, was the only other witness who testified at the trial. He was first called as an adverse witness under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 60) by the plaintiff and later testified as an expert witness on behalf of the defendants. In explaining the saw's proper operating procedures, he stated that in order to make a straight rip cut it is necessary that the blade be exactly parallel to the rip fence. If there is no parallelism between the rip fence and the blade so that the front of the blade is at a greater distance from the rip fence than is the back of the blade, the piece being cut will have a tendency to bind. He also stated that the operator must align the splitter so that it is parallel to the saw blade in order to prevent the piece being cut from striking the front of the splitter and causing resistance. The plaintiff had testified that he was not aware that the blade could be out of alignment and not parallel

to the rip fence. According to Stackhouse, if the blade, rip fence and splitter were properly aligned an operator cutting a 4' piece of plywood would experience no binding or resistance.

Through the testimony of Stackhouse, who was responsible for the evaluation of the safety of each type of table saw manufactured by Emerson, the plaintiff attempted to show that his injury would have been prevented had the saw been equipped with a locked-in-place guard. In this regard, Stackhouse testified that the original guards used on table saws were made of heavy aluminum or steel and that their weight would cause scratching or marring of wood. To correct this problem a locked-in-place guard was designed which allowed an operator to lock the guard at a level slightly above the piece being cut. Although he emphasized that the locking guards were not originally designed for safety reasons, he stated that the industry abandoned this type of guard because of numerous accidents which subsequently resulted. According to Stackhouse, operators were cutting themselves during the nonsawing part of the operation while the guard was up and they would also tend to lock the guard at its highest position rather than readjust it according to the thickness of the piece being cut. Although these accidents had occurred in an industrial setting, the locking guards were also rejected for home use because a manufacturer, such as Emerson, had no control over the ultimate use of a table saw after its sale.

Stackhouse related that the plastic floating guard on the plaintiff's table saw had been in production for approximately 11½ years, and to his knowledge, the locked-in-place guard was no longer available. He explained that the function of the plastic guard was to provide protection to the operator both before the actual cutting and during cutting inasmuch as the saw is often operating even when a piece is not being fed into it. The plastic guard envelopes the blade at all times thus affording complete protection from contact from the top and both sides. As the piece is fed into the saw it contacts the guard first. Because the front of the guard is radiused, the shield will rise up and remain in contact with the piece being cut allowing it to slide underneath it into the blade. There is always protection from contact with the rear of the blade.

Upon questioning by the plaintiff, Stackhouse admitted that a locking guard, properly adjusted in accordance with the thickness of the piece being cut, would be safer from the front once the cut was begun; however, he added that after the back end of the piece reached the front of the blade there would be exposure from the front as well as from both sides. Stackhouse further testified that the Occupational Safety and Health Administration (OSHA) mandated manufacturers of table saws to equip them with free riding or floating guards as opposed to locked-in-place devices. Evidence was also adduced that the floating guard used by

Emerson complied with the American National Standards Institute (ANSI) standards which provide for a hooded type guard such that will cover the blade at all times when the saw is not in use. This may be accomplished by the use of a guard which automatically adjusts to the thickness of the material being cut, or by a fixed or manually adjusted guard. Stackhouse concluded that in his opinion, based on a reasonable degree of engineering certitude, the Emerson guard was reasonably designed for safety during operational conditions. No further evidence was introduced to the contrary by the plaintiff.

Defendants contend that the plaintiff failed to sustain his burden of proof that the safety guard of the bench saw was negligently designed and, therefore, argue that the trial court erred in denying its motion for a directed verdict at the close of the plaintiff's case and at the close of all of the evidence. We agree.

■■■ During arguments on defendants' directed verdict motions the plaintiff successfully argued that under a given set of circumstances, those peculiar to his injury, the table saw would have been safer and his injury would have been prevented had it been equipped with a locked-in-place guard rather than a floating guard. Such an argument ignores the fact that the theory of design negligence falls within the framework of a general tort negligence theory and is thereby limited by general negligence rules. Hence, it is the manufacturer's duty to design a product so that it will be reasonably safe for its intended use and for any reasonably foreseeable use; conversely, the injured plaintiff to prevail must show that the quality of the particular product is insufficient and that the duty of care on the part of the manufacturer required it to design something safer for the user. (*Murphy v. Cory Pump & Supply Co.*, 47 Ill. App. 2d 267, 197 N.E.2d 849 (4th Dist. 1964).) Of course by his argument the plaintiff assumes that he would have properly adjusted the height of a locked-in-place guard according to thickness of the plywood piece he was cutting. However, in light of the plaintiff's knowledge of the saw's broken rip fence and his failure to adjust the saw blade to a height just greater than the thickness of the plywood piece, there is no reason to believe that he would have so adjusted a locking safety guard. Moreover, the alleged danger inherent in the floating guard was not latent but was obvious to anyone. It is apparent to any observer that if during a cutting operation an operator was to position his hand directly in front of the blade, while at the same time pushing material into the saw causing the guard to ride up onto the piece, frontal contact with the blade is possible. Such a possibility, however, does not alone demonstrate a lack of due care on the part of the manufacturer.

■■■ We are of the opinion that where, as here, the manufacturer has endeavored to construct a product to function properly for the purpose

for which it is designed and its operation creates no danger that is not known to the user, the manufacturer has satisfied its duty. Notwithstanding plaintiff's unfortunate injury, a manufacturer is under no duty to make a machine foolproof against all possible accidents. (*Denton v. Bachtold Brothers, Inc.*, 8 Ill. App. 3d 1038, 291 N.E.2d 229 (4th Dist. 1972); *Willeford v. Mayrath Co.*, 7 Ill. App. 3d 357, 287 N.E.2d 502 (4th Dist. 1972).) For these reasons we conclude that the evidence in this cause viewed in its aspect most favorable to the plaintiff so overwhelmingly favors the defendants that no contrary verdict based on this evidence could stand under the theory advanced by the plaintiff. (*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 229 N.E.2d 504 (1967).) Accordingly, we find that the trial court improperly denied defendants' motions for directed verdict at the close of plaintiff's case and at the close of all of the evidence.

For the foregoing reasons, the judgment of the Circuit Court of St. Clair County is reversed.

Reversed.

EBERSPACHER, P. J., and FRIEDMAN, J., concur.