2018 IL App (3d) 170116

Opinion filed February 28, 2018

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2018

| KARRIE POMMIER, | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| Plaintiff-Appellant, | ) | Kankakee County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | |
| JUNGHEINRICH LIFT TRUCK | ) | |
| CORPORATION, MULTITON MIC | ) | |
| CORPORATION, and CALUMET LIFT | ) | |
| TRUCK CORPORATION, | ) | Appeal No. 3-17-0116 |
| | ) | Circuit No. 12-L-180 |
| Defendants | ) | |
| | ) | |
| (Jungheinrich Lift Truck Corporation and | ) | |
| Multiton Mic Corporation, | ) | |
| | ) | |
| Defendants-Appellees, | ) | |
| | ) | |
| EMD Millipore Corporation, | ) | Honorable Adrienne W. Albrecht, |
| | ) | Judge, Presiding. |
| Third-Party Defendant). | ) | |

JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Justices McDade and Wright concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiff, Karrie Pommier, filed this lawsuit after she allegedly injured her right shoulder

while operating an electric pallet jack at work on October 29, 2009. Her complaint alleged strict

products liability and negligence claims against Jungheinrich Lift Truck Corporation (JLT),

Multiton Mic Corporation (MMC), and Calumet Lift Truck Service Company, Inc. (Calumet). The trial court granted Calumet summary judgment on the strict liability claim but denied Calumet summary judgment on the negligence claim. The court later granted JLT and MMC (defendants) summary judgment on all claims. Plaintiff appeals this judgment. We affirm.

¶ 2                                    BACKGROUND

¶ 3        On September 29, 2011, plaintiff filed her complaint in Cook County. In October 2012, the court transferred the case to Kankakee County pursuant to Illinois Supreme Court Rule 187 (eff. Aug. 1, 1986). The complaint alleged that plaintiff worked as a manufacturing operator at EMD Millipore Corporation (Millipore). On October 29, 2009, she injured her right shoulder while operating a Multiton ELE 45 electric pallet jack for Millipore.

¶ 4        The complaint alleged negligence and strict products liability claims against defendants. Count I alleged that defendants "carelessly and negligently developed, designed, manufactured, distributed, and sold [the jack] such that it could suddenly stop functioning; *** without conducting or obtaining adequate research that the control circuitry and machine was generally recognized as safe; [and] *** when it knew or should have known that the particular product may cause injury to its operators." Count II alleged that the jack "was in a defective condition, unreasonably dangerous for its intended use" because "the device spontaneously malfunctioned without warning; there were inadequate power controls for movement of the device; the controls permitted unexpected, sudden application of the brakes during movement; [and] the emergency stopping protocol engaged in unplanned or unexpected situations."

¶ 5                          I. The Pallet Jack's Alleged Defect

¶ 6        When they examined the jack, experts for both sides found that someone previously inverted the jack's brake cam. Neither expert found any other defect. The jack's braking system

2

employs three primary parts: the tiller handle, the cam, and the roller switch. Operators use the tiller handle to steer and drive the jack. The cam is mounted at the base of the tiller. It rotates over the fixed roller switch as the operator raises or lowers the tiller. Contact between the cam and the roller switch activates the brakes.

¶ 7 The cam is designed to contact the roller switch when the tiller reaches certain angles. Based on the jack's design, an operator cannot physically position the tiller in any range between 0 degrees (parallel to the ground) and 15 degrees. The designed lower braking range is between 15 degrees and 34 degrees—when an operator lowers the tiller to angles in this range, the cam should contact the roller switch and activate the brakes. The designed upper braking range is between 80 degrees and 90 degrees. The "F arc" should be between 34 degrees and 80 degrees. When an operator positions the tiller within the "F arc," the brakes should not activate.

¶ 8 The cam screws onto a stud affixed to the tiller. A nut in the center of the cam holds it in place. If someone tightens the nut without holding the cam in place, the cam may rotate with the nut as it is secured. Properly installed, the cam should sit horizontally while the tiller rests at a 39-degree angle.

¶ 9 During her deposition, plaintiff testified that she operated the jack on October 29, 2009. She walked in front of the jack and held onto the tiller handle with her right hand. Her right arm extended behind her; her hand and the tiller handle were positioned just above her waist. As plaintiff continued to move forward, the jack stopped and caused "a pulling in her shoulder." She stated: "If you would walk it would— it would automatically stop on you. You could be walking and it would just—it would just stop and it would jerk you."

¶ 10 Plaintiff's expert, Daniel Pacheco, opined that the inverted cam caused plaintiff's injury "and similar [prior] incidents" that plaintiff's coworkers reported. He opined that defendants

negligently designed the jack's brake system by failing to preclude the possibility of someone inverting the cam. He offered a "technologically and economically feasible" alternative lock nut design that would require a key to adjust the cam. He also opined that defendants should have included on-machine instructions with embedded warnings that explained how to properly position the cam.

¶ 11        Pacheco concluded that the cam's inverted position "had the effect of causing the brake to be applied when the steering tiller was higher in the lower braking range than it should have been." However, his findings from examining the jack refuted this conclusion. Pacheco found that the tiller's travel arc—the total range in which an operator could physically position the tiller—totaled 74.2 degrees (*i.e.*, any range between 15 to 15.8 degrees and 89.2 to 90 degrees). He also found that the lower brake arc totaled 10 degrees. Because an operator cannot physically position the tiller below a 15-degree angle, Pacheco's lower brake arc ranged from 15 degrees to 25 degrees. Finally, Pacheco concluded that the upper brake arc totaled just 1.5 degrees (approximately 88 to 90 degrees). According to Pacheco's findings, the inverted cam could not activate the brakes unless plaintiff positioned the tiller below 25 or above 88 degrees—well past the threshold for each designed brake range (34 degrees and 80 degrees, respectively). In other words, the inverted cam made the brakes *less* likely to activate.

¶ 12                                    II. The Pallet Jack's History

¶ 13        The manufacturer, which is not a party to this lawsuit, produced the jack in 1999. Millipore, plaintiff's employer, bought it new the same year. Defendants are the manufacturer's wholly-owned subsidiaries and distributors. Millipore hired Calumet to periodically maintain the jack. During discovery, Millipore and Calumet failed to produce any service records from 1999

4

through most of 2008. The record lacks any evidence indicating what service or alterations Millipore and Calumet performed for nearly a decade after Millipore purchased the jack.

¶ 14    The jack came with two manuals, an operating manual and a service manual. The operating manual specifically prohibits operators from repairing or modifying the jack: "Without specific training and express authorization the driver is not allowed to perform any repairs or modifications on the [jack]. Under no circumstances must the driver change the setting of switches or safety installations, or render them ineffective." The operating manual also states that only "expert personnel of the manufacturer" may perform maintenance on the jack. The maintenance personnel may not modify it in any way. They also must "recommission" the jack after performing maintenance. Before "recommissioning" the jack, maintenance personnel must "check the brake for correct function."

¶ 15    Plaintiff claims that defendants failed to produce the correct service manual during discovery. Joern Soukup, a Jungheinrich employee, testified about the service manual's contents. He stated that the manual "provides expert personnel with the specific manner in which the tiller handle must be positioned for correct function." The manual indicates that the upper braking range requires the operator to position the tiller between 80 and 90 degrees; the lower braking range requires the operator to position the tiller between 15 and 34 degrees.

¶ 16    Soukup also testified that the manufacturer employed several processes to ensure the brake system operated properly before shipment. First, the manufacturer used special equipment to secure the tiller at a 39-degree angle. Then, an employee used a 24-millimeter wrench to correctly position the cam while tightening the nut. A 24-millimeter wrench cannot fit around the cam if it is not positioned properly. Next, the manufacturer performed a "lamp test" where it wired an electronic device into the brake switch to ensure the brake operated within the proper

ranges. Finally, the manufacturer tested each jack's brakes at least three times before shipment: on the assembly line, after assembly, and during a documented final inspection before shipment.

¶ 17     Defendants' expert, Michael Rogers, opined that the manufacturer correctly positioned the cam, and it remained properly positioned when the jack left defendants' control. He based his opinion on Soukup's description of the manufacturer's procedures. He also observed that using a 24-millimeter wrench made it impossible to invert or misalign the cam. Rogers and Pacheco agreed that patterns of uneven wear and tear on the roller switch and cam ("witness marks") suggested that the cam was previously properly positioned.

¶ 18                    III. Procedural History

¶ 19     On September 20, 2016, defendants filed a combined motion for summary judgment. Despite her lack of evidence indicating that defendants inverted the cam, plaintiff maintained that the brake system design was defective because it did not prevent operators and other third parties from inverting the cam. Plaintiff also claimed that defendants should have foreseen that someone could and would invert the cam. On January 11, 2017, the trial court granted defendants' motion. The court determined that plaintiff failed to show that defendants could reasonably foresee the cam modification when they designed the jack. The court also determined that plaintiff failed to provide any evidence that the inverted cam caused plaintiff's injury. We agree with the trial court's judgment.

¶ 20                         ANALYSIS

¶ 21     We review trial courts' orders granting summary judgment *de novo*. *Horwitz v. Holabird & Root*, 212 Ill. 2d 1, 8 (2004). Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." 735 ILCS 5/2-1005(c) (West 2016). Parties opposing summary judgment must present evidence sufficient to establish a genuine issue of material fact or that the moving party is not entitled to judgment as a matter of law. *Performance Food Group Co., LLC v. ARBA Care Center of Bloomington, LLC*, 2017 IL App (3d) 160348, ¶ 18. We review the trial court's judgment, not its reasoning, and we may affirm on any basis supported by the record. *Hope v. Hope*, 398 Ill. App. 3d 216, 220 (2010).

¶ 22        Plaintiff appears to abandon her negligence claims on appeal. Plaintiffs who raise negligence claims "must do more than simply allege a better design for the product; [they] must plead and prove evidence of a standard of care by which to measure a defendant's design and establish a deviation from that standard." *Blue v. Environmental Engineering, Inc.*, 215 Ill. 2d 78, 96 (2005). Plaintiff's brief fails to mention such a standard of care or reference evidence tending to show that defendants deviated from it. Instead, plaintiff focuses on a single defective condition (the inverted cam) and defendants' liability for its existence. This is a strict products liability argument.

¶ 23        Under Illinois law, a plaintiff bringing a strict products liability action must prove the following elements: (1) an unreasonably dangerous product condition that resulted from manufacturing or its design, (2) the existence of the condition existed when the product left the defendant's control, and (3) the condition having proximately caused plaintiff's injuries. *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 543 (2008).

¶ 24        In the trial court proceedings, plaintiff presented no evidence that defendants inverted the cam before selling the jack to Millipore in 1999. In fact, no party has disclosed evidence regarding the cam's positioning or the jack's maintenance prior to 2008. The trial court determined that plaintiff failed to prove that defendants could reasonably foresee the defect or

7

that it proximately caused plaintiff's injury. On appeal, plaintiff argues that the record sufficiently establishes that the jack's design was defective and proximately caused her injuries. We address her arguments below.

¶ 25                                    I. Defective Design

¶ 26        Plaintiff advances two arguments in support of her design defect claim. First, she claims that inverting the cam did not substantially modify the jack's design; the defective design existed before the jack left defendants' control. Alternatively, plaintiff argues that defendants should have foreseen operators' modifications and other third parties' negligent acts or omissions. She claims that defendants remain liable for such foreseeable events. We reject both arguments.

¶ 27                                    A. Modification

¶ 28        Plaintiff argues that a person "modifies" a product only if he or she removes, adds, or substitutes the product's parts or alters how operators use it. Based on this definition, plaintiff argues that the inverted brake cam cannot constitute a "modification" that absolves defendants' liability. No evidence indicated that someone removed, added, or substituted the jack's parts. Nor did any evidence indicate that the inverted cam required plaintiff to operate the jack differently than its design intended.

¶ 29        We reject plaintiff's definition because "alteration, modification or change" is already defined by statute as "an alteration, modification or change that was made in the original makeup characteristics, function or design of a product or in the original recommendations, instructions and warnings given with respect to a product including the failure properly to maintain and care for the product." 735 ILCS 5/13-213(a)(1) (West 2016). Courts have characterized alterations that do not add, remove, or substitute parts as modifications in products cases. See *Masters v. Hesston Corp.*, 291 F.3d 985, 989-90 (7th Cir. 2002) (misaligning a twine tube while rewelding

8

it to a hay baler); *Davis v. Pak-Mor Manufacturing Co.*, 284 Ill. App. 3d 214, 217-18 (1996) (rewiring a garbage truck's switch); *Gowler v. Ferrell-Ross Co.*, 206 Ill. App. 3d 194, 200 (1990) (disabling a lever); *Kempes v. Dunlop Tire & Rubber Corp.*, 192 Ill. App. 3d 209, 215 (1989) (cutting into a golf ball). The statutory definition clearly contemplates all unintended changes to a product's original components and all deviations from the manufacturer's recommended maintenance.

¶ 30　　Section 213(a)(1)'s definition coincides with the well-settled principle that manufacturers are not insurers. *Hunt v. Blasius*, 74 Ill. 2d 203, 211 (1978). Because manufacturers are not insurers, the law does not automatically attribute defects caused by unintended alterations to the product's design or manufacturing. For example, an automobile's wheel might become unreasonably dangerous if the driver loosens the lug nuts. Although the driver did not add, substitute, or remove parts, or alter the way in which he or she drove the automobile, the manufacturer never intended for the wheel to function with loosened lug nuts. On the other hand, if the driver pushes a button or operates a lever to adjust the driver's seat or steering wheel, no modification occurs; the manufacturer clearly intended the seat and steering wheel to adjust based on the driver's physical stature. See, *e.g.*, *Stehl v. Brown's Sporting Goods, Inc.*, 236 Ill. App. 3d 976 (1992).

¶ 31　　In lockstep with the statutory definition and principles of products liability law, we find that the inverted brake cam constituted a modification in this case. We now must determine whether defendants could reasonably foresee this modification.

¶ 32　　　　　　　　　　　　　　　　　B. Foreseeability

¶ 33　　Plaintiff argues that defendants remain liable because they could reasonably foresee, as a matter of law, that operators could and would modify the jack's braking system, including the

9

cam. Plaintiff also argues that a question of facts exists as to whether defendants could foresee Calumet's or some other nonoperator's negligence. It is important to note that plaintiff presented no evidence showing who inverted the brake cam—an operator or other Millipore employee, a Calumet agent, or some other third party.

¶ 34     We summarily reject plaintiff's argument that defendants remain liable if Calumet or another nonoperator third party negligently inverted the brake cam. Plaintiff cites no law supporting this proposition. Whether defendants could foresee that some professional might negligently service the jack or alter its original design is irrelevant. In retrospect, almost anything is foreseeable. *Majumdar v. Lurie*, 274 Ill. App. 3d 267, 271 (1995) (citing *Mieher v. Brown*, 54 Ill. 2d 539, 544 (1973)). We reiterate that "[p]roducts liability does not make the manufacturer an insurer of all foreseeable accidents which involve its product." *Hunt*, 74 Ill. 2d at 211. It is conceivable that expert maintenance personnel or service companies like Calumet might negligently maintain a product or alter its functionality. However, the law does not deem manufacturers forever liable for such negligence beyond their control. See *Kirby v. General Motors Corp.*, 10 Ill. App. 3d 92, 96 (1973). Manufacturers have no duty to design foolproof products immune from all possible accidents. *Flaugher v. Sears, Roebuck & Co.*, 61 Ill. App. 3d 671, 676 (1978).

¶ 35     In some cases, however, manufacturers must anticipate modifications that *operators* can easily effect. *DeArmond v. Hoover Ball & Bearing*, 86 Ill. App. 3d 1066, 1071 (1980). The two factors relevant to this analysis are whether operators *could* easily modify the product and whether the manufacturer should reasonably anticipate that operators *would* modify the product for some particular reason. See *id.*; *Woods v. Graham Engineering Corp.*, 183 Ill. App. 3d 337, 342 (1989); *Foster v. Devilbiss Co.*, 174 Ill. App. 3d 359, 363 (1988).

¶ 36    Plaintiff argues that defendants could reasonably foresee that operators could modify the brake cam; an operator without any specific expertise could access the cam by using common tools such as screwdrivers and wrenches. Plaintiff also claims that an operator would foreseeably maintain the jack's brake system as the operating manual requires.

¶ 37    Plaintiff's argument lacks a necessary ingredient—proof that an operator inverted the cam. Unlike in *DeArmond* and *Foster*, plaintiff presented no evidence that an operator modified the product. Whether defendants should have reasonably foreseen that an operator could and would invert the cam is irrelevant if an operator did not invert the cam.

¶ 38    Even if we assume, *arguendo*, that an operator inverted the cam, plaintiff's argument still fails. Although we agree that operators can use common tools such as screwdrivers and wrenches to access the cam, plaintiff presents no evidence that operators typically understand the interacting functions of the tiller handle, cam, and switch roller. Nor does plaintiff provide any evidence that operators' regular job duties include adjusting or maintaining the jack's braking system.

¶ 39    In fact, the operating manual specifically prohibits operators from performing maintenance on the jack. The manual states: "Without specific training and express authorization the driver is not allowed to perform any repairs or modifications on the jack. Under no circumstances must the driver change the setting of switches or safety installations, or render them ineffective." Clearly, defendants intended to *prohibit* operators from maintaining or modifying the jack's braking system. Defendants could not reasonably foresee that operators would ignore this express and unambiguous direction.

¶ 40    The trial court correctly determined that plaintiff failed to present sufficient evidence to survive summary judgment. Plaintiff cannot prove that defendants inverted the brake cam or that

11

they should have reasonably foreseen that someone would later invert the cam during a repair, thus rendering the design defective. We agree with the trial court's determination.

¶ 41                                    II. Proximate Cause

¶ 42        Although our holding above is sufficient to affirm summary judgment, we briefly address plaintiff's proximate cause argument. Although proximate cause is typically a question of fact, a court may determine the issue as a matter of law if the evidence shows that plaintiff "would never be entitled to recover." *Abrams v. City of Chicago*, 211 Ill. 2d 251, 257-58 (2004). Proximate cause incorporates two elements—cause in fact and legal cause. *Id.* at 258.

¶ 43        Plaintiff argues that her deposition testimony provided sufficient evidence to survive summary judgment. She testified that the jack "would automatically stop" and "jerk" operators. On the date of her injury, plaintiff pulled the machine behind her with her right arm. She positioned her right hand and the tiller handle just above her waist. As she walked forward, the jack "suddenly stopped" and pulled her shoulder. In her brief, plaintiff contends that her injury "occurred as a result of the [jack] stopping suddenly when plaintiff operated the machine for its intended purpose; pulling it behind her within the proper 'F' range." She claims that her testimony sufficiently shows that the allegedly defective design, which permitted the inverted cam, caused the jack to brake erratically or suddenly stop.

¶ 44        Plaintiff's testimony fails to satisfy the "cause in fact" element. Her own expert shoots this argument out of the water. Her expert's findings do not indicate that the inverted cam caused the jack to stop erratically; instead, they revealed that the inverted cam *decreased* the upper and lower braking ranges. This means that the alleged defect *increased* the "F" range within which operators could freely move the jack. Although plaintiff testified that the jack suddenly stopped, no factual findings or even expert opinions support plaintiff's argument that the alleged defect

12

caused the sudden stop. "The existence of proximate cause cannot be established by speculation, surmise, or conjecture." *Majetich v. P.T. Ferro Construction Co.*, 389 Ill. App. 3d 220, 224 (2009).

¶ 45　　　　Plaintiff also failed to present sufficient evidence that she positioned the tiller within the "F" range when she sustained her injury. She testified that she pulled the jack behind her and positioned her right hand and the tiller handle just above her waist. The jack's braking system engages based on the tiller's angle, not its height. Plaintiff failed to present evidence demonstrating the *angle* at which she positioned the tiller handle when she sustained her injury. Without demonstrating that she, in fact, positioned the tiller within the "F" range, rather than the lower braking range, plaintiff cannot recover in this case.

¶ 46　　　　We agree with the trial court that plaintiff failed to present sufficient evidence demonstrating that the inverted cam caused her injuries. We affirm the trial court's judgment.

¶ 47　　　　　　　　　　　　　　　　CONCLUSION

¶ 48　　　　For the foregoing reasons, we affirm the judgment of the Kankakee County circuit court.

¶ 49　　　　Affirmed.