**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 200541-U

Order filed February 28, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| DAVE HUSTON, as Independent Administrator of the Estate of JEREMY D. HUSTON, Deceased, | ) ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| P.J. HOERR, INC., | ) ) | |
| Defendant-Appellee. | ) ) | Appeal No. 3-20-0541 Circuit No. 16-L-89 |
| P.J. HOERR, INC., | ) ) ) | |
| Third Party Plaintiff-Cross Appellant, | ) ) | |
| v. | ) ) ) | |
| SNS CONSTRUCTION SERVICES, INC., | ) ) | The Honorable Michael D. Risinger, |
| Third Party Defendant-Cross Appellee. | ) ) | Judge, presiding. |

_____

JUSTICE McDADE delivered the judgment of the court.
Justices Daugherity and Holdridge concurred in the judgment.

_____

**ORDER**

¶ 1      *Held*:  The circuit court did not err when it granted summary judgment in favor of the defendant or when it dismissed a third-party complaint for contribution as moot.

¶ 2      The plaintiff, Dave Huston, as independent administrator of his deceased son's estate, filed a two-count negligence complaint against the defendant, P.J. Hoerr, Inc. (PJH), which was the general contractor at the construction site where the decedent suffered his injuries. Thereafter, PJH filed a third-party complaint for contribution against Jeremy's employer, SNS Construction Services, Inc. (SNS). Following discovery, PJH and SNS filed motions for summary judgment on Huston's first amended complaint and PJH's third-party complaint for contribution, respectively. After finding Huston could not prove the proximate cause of Jeremy's accident, the circuit court granted summary judgment for PJH and dismissed PJH's third-party complaint for contribution as moot. On appeal, Huston argues that the circuit court erred when it (1) granted summary judgment in favor of PJH, and (2) PJH did not retain control over the construction site. We affirm.

¶ 3                        I.  BACKGROUND

¶ 4      On December 10, 2015, Jeremy was working for SNS at a construction site owned by the National Electrical Contractors Association (NECA). Jeremy had been using a scaffold to install drywall. An accident occurred that day and Jeremy sustained head injuries. He eventually died from those injuries.

¶ 5      *Huston's First Amended Complaint and PJH's Third-Party Complaint for Contribution*

¶ 6      On November 9, 2016, Jeremy's father, Dave Huston, as independent administrator of Jeremy's estate, filed a two-count first amended complaint against the general contractor on the construction site, PJH. In count I, under sections 1 and 2 of the Wrongful Death Act (740 ILCS 180/1, 2 (West 2016)), Huston alleged that PJH was negligent in its control, supervision, coordination, and inspection of the construction site, the ongoing work, and the scaffold used by

2

Jeremy. The complaint alleged that the scaffold on which Jeremy was working "tipped over and caused *** [Jeremy] to fall to the ground and strike his head," which eventually resulted in his death. In count II, Huston alleged that due to his severe injuries, Jeremy was "prevented from attending to his usual duties and affairs and lost the value of that time." Jeremy also allegedly "expended and became liable for large sums of money for medical care and services." Huston requested monetary damages under both counts.

¶ 7        On September 7, 2017, PJH filed its answer and affirmative defenses to Huston's first amended complaint. PJH alleged several ways in which Jeremy negligently caused his own injuries. Accordingly, PJH sought a ruling that would bar or diminish Huston's requested damages pursuant to section 2-1116 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1116 (West 2016)).

¶ 8        On July 27, 2016, PJH filed a third-party complaint for contribution against Jeremy's employer, SNS. PJH alleged it was SNS, as Jeremy's employer, who committed the negligent acts or omissions contained in Huston's first amended complaint. Under its subcontract with SNS, PJH also alleged that SNS was required to perform its work in a safe manner, adhere to PJH's safety measures, comply with applicable laws and regulations, and take responsibility for the safety of its employees. Under the Illinois Contribution Among Joint Tortfeasors Act (740 ILCS 100/0.01 *et seq.* (West 2016)), PJH sought SNS' contribution to any damages awarded to Huston based on his first amended complaint.

¶ 9                          *Cross-Motions for Summary Judgment*

¶ 10        On April 20, 2020, PJH filed a motion for summary judgment. PJH argued that because no one witnessed Jeremy's accident, Huston could only speculate as to the cause of Jeremy's injuries. PJH also argued that pursuant to its subcontract with SNS and the Restatement (Second)

3

of Torts § 414 (1965), SNS had exclusive control over Jeremy's work and the scaffold involved in the accident.

¶ 11　　　　On April 29, 2020, SNS filed a motion for summary judgment on PJH's third-party complaint. Like PJH, SNS argued that because no one witnessed Jeremy's accident, Huston could not definitively prove that Jeremy's death resulted from PJH's negligence or a defective scaffold. Thus, because Huston could not prove PJH was liable for Jeremy's death, PJH could not prove SNS was liable for contribution and PJH's third-party complaint would be moot.

¶ 12　　　　On July 23, 2020, Huston filed a response to PJH's motion for summary judgment. First, Huston argued that Jeremy was working on the scaffold in a room with an uneven concrete pad and a debris-covered surface. When viewed in a light most favorable to his position, Huston maintained this circumstantial evidence supported a reasonable inference that Jeremy's accident was caused by "the wheels of the scaffolding system bec[oming] entrapped in the debris (or *** placed on the [uneven] concrete pad) and tipp[ing] over." Huston suggested that PJH created, or left unmitigated, unsafe work conditions and "prevented *** [Jeremy's] use of a scissor lift ***, which would have provided a more stable and safe[] platform for Jeremy to complete his work." Huston argued that, at a minimum, a genuine issue of material fact existed regarding causation.

¶ 13　　　　Second, Huston argued that PJH's general contract with NECA, safety manual, and pre- and post-accident conduct proved that PJH retained control of the construction site under section 414 of the Restatement by knowingly assuming responsibility for the means, methods, schedule, and safety of the work on the premises. Further, as a result of PJH's retained control, Huston argued that PJH "dictated and had control over [the] debris laydown areas," including in the room where Jeremy fell. By designating that room as a "debris laydown area[]," PJH allegedly retained control over the manner and means of SNS's work because the debris forced Jeremy to

4

utilize a scaffold instead of a scissor lift. Huston emphasized that because SNS was required to undergo a "[s]afety stand-down with all crews" and to suspend the use of scaffolds until after SNS employees were retrained on scaffold safety after Jeremy's accident, PJH's retained control was readily apparent.

¶ 14     The parties' pleadings on summary judgment relied on various depositions and documents.[1] We briefly summarize that evidence as follows.

¶ 15                          *PJH's General Contract with NECA*

¶ 16     In part, PJH's general contract with NECA imposed responsibility on PJH "for initiating, maintaining[,] and supervising all safety precautions and programs in connection with the performance of the Contract." PJH was also required to "take reasonable precautions for [the] safety of, and *** provide reasonable protection to prevent damage, injury[,] or loss to" the "employees on the Work and [the] other persons who may be affected thereby."

¶ 17     The general contract also required PJH to comply with applicable laws, regulations, and orders "bearing on [the] safety of persons *** or their protection from damage, injury[,] or loss." PJH had to "erect and maintain *** reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations[,] and notifying owners and users of adjacent sites and utilities." PJH agreed to "keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by" the work.

---

[1] The evidence of record also includes an inquest from the Office of the Peoria County Coroner. On appeal, Huston relies on witness testimony contained in that inquest. However, section 3-3031 of the Counties Code provides:

> "[I]n any suit or proceeding *** commenced for the recovery of damages arising from or growing out of injuries caused by the negligence of any person, firm or corporation resulting in the death of any person ***, neither the coroner's verdict returned upon the inquisition as provided herein, nor a copy thereof, shall be admissible as evidence to prove or establish any of the facts in controversy in said civil suit or proceeding." 55 ILCS 5/3-3031 (2020).

Therefore, our court will not consider the coroner's inquest in the present appeal.

5

Once the work was completed, PJH had to "remove waste materials, rubbish, *** tools, construction equipment, machinery and surplus materials from *** the Project."

¶ 18                                *PJH's Subcontract with SNS*

¶ 19        Under its subcontract with PJH, SNS agreed "to furnish all labor, supervision, materials, transportation, equipment, temporary facilities and incidentals necessary for the proper execution and completion" of its work. Specifically, SNS agreed to "provide all tools and equipment required to perform the work in an expeditious manner[,] *** includ[ing] but *** not limited to scaffolds, ladders, man lifts, [and] hoisting and specialty equipment." SNS agreed to clean up and remove all debris "created by its operations no less than once each week." Further, SNS was required to "comply with all safety measures initiated by P.J. Hoerr or the Contract Documents." SNS agreed to comply with all laws and regulations related to the safety of persons and property on the construction site. SNS was "solely responsible for the protection, safety and safety instruction of their employees *** [and] for safety means and methods."

¶ 20                                *Deposition of Jason Ariana*

¶ 21        Jason Ariana was SNS' foreman on the date of Jeremy's accident, which was also Ariana's first day of employment with SNS. Ariana had received safety training with respect to scaffolds, scissor lifts, and first aid.  Ariana stated that Jeremy was working as his apprentice on the day of the accident. They had been tasked with hanging drywall. To facilitate this work, Ariana and Jeremy utilized a scaffold with wheels. In carpentry, Ariana stated it is common for a scaffold to be moved while work is ongoing. The scaffold was "already put together" when they began their work, so Ariana made sure "everything was locked in place and ready to work off of." Ariana lacked knowledge as to who owned or erected the scaffold. Further, Ariana believed the scaffold had side rails that were over six feet tall, a work platform that was three feet by six

6

feet, and a height of approximately 5½ feet from the ground to the work platform. Ariana testified that the scaffold was configured in a manner consistent with the picture depicted below.



¶ 22        Ariana began the day on the scaffold. Jeremy was off the scaffold, cutting pieces of drywall that he would then hand to Ariana. At some point, Ariana and Jeremy switched roles. Before Jeremy's accident, Ariana was called away to tend to work in a nearby room on the construction site. At the time Ariana left the room, Jeremy was on the scaffold installing the remaining drywall with a screw gun. Approximately 20 minutes later, Ariana heard Jeremy shout "hey, hey." Ariana then heard a crashing sound, which he described as "metal falling or the crash of scaffolding."

¶ 23        Ariana immediately returned to the room where Jeremy had been working and saw that Jeremy and the scaffold were on the floor. Ariana stated the scaffold was "intact" and not broken into pieces. Ariana recalled that Jeremy was lying outside of, not within, the scaffold. Jeremy was unresponsive and bleeding from his ears. Ariana was the first person to enter the room after the accident. After seeing Jeremy on the floor, Ariana yelled for help from a nearby worker, then went to look for the superintendent and to call 911.

7

¶ 24     When asked if Ariana noticed "debris of any kind on the floor" when he left Jeremy alone, Ariana replied, "[t]here was stuff in there, yes." Ariana was unsure about how much debris was present or who was responsible for placing it in that location. The debris was already in the room when Ariana and Jeremy began their work. Aside from a scaffold, Ariana agreed that a lift could have been used to perform the work. Ariana was unaware if a lift was available for use on the construction site. Ariana stated he is more comfortable working from a lift, as opposed to a scaffold, because an individual can tie off to a lift and have "cages around you." Ariana believed lifts are safer and more stable than scaffolds.

¶ 25     Ariana believed he was required to comply with PJH's requests for the performance of work, work stoppages, and compliance with safety rules. Therefore, if PJH had ordered Ariana to use a lift instead of a scaffold, then Ariana believed he would have been required to comply with that order. To utilize a lift, Ariana stated the work areas must be clear of debris. Ariana stated that the superintendent for the general contractor typically designates the staging areas and the debris-laydown areas. Ariana was unsure who designated the debris-laydown areas at that location. Based on the layout of the room and the presence of debris, Ariana agreed he and Jeremy could not have utilized a lift to facilitate their work.

¶ 26     Ariana was unsure whether the wheels to the scaffold were in a locked or unlocked position at the time of Jeremy's accident. However, Ariana stated that it is common for a scaffold to be moved while carpentry work is ongoing. Further, on the date of Jeremy's accident, Ariana noticed a concrete pad in the room where he and Jeremy were working. At some point, Ariana said the scaffold was positioned on top of the concrete pad. Ariana did not know whether the scaffold was on top of the concrete pad when he left Jeremy to work alone. When Ariana

8

returned to the room after Jeremy's accident, the scaffold was "a foot, maybe better," from the concrete pad.

¶ 27                    *Deposition of Scott Ruskusky*

¶ 28        Scott Ruskusky was a laborer for a subcontractor, Summit Masonry, on the date of Jeremy's accident. Ruskusky's work on NECA's site occurred outdoors. Ruskusky did not witness Jeremy's accident. He was outside the main entrance of the building when a "gentleman came out on his phone and said he had a man down inside." Ruskusky added that the gentleman stated, "[a] man fell." At that point, Ruskusky entered the building. Within a minute of being informed that "[a] man fell," Ruskusky was in the room where Jeremy's accident occurred. At that time, Ruskusky stated he was the only other person besides Jeremy who was in the room. Between 30 seconds to one minute later, another laborer from Summit Masonry also entered the room. Ruskusky noticed a scaffold was down on the ground. Jeremy was bleeding from his ears and "had the scaffold and drywall on top of him." Ruskusky stated he and the other worker lifted the scaffold off Jeremy and placed it to the side of the room. Ruskusky and the other worker lifted at least a handful or an armful of broken drywall pieces off Jeremy.

¶ 29        Initially, Ruskusky did not recall if the scaffold was intact or in pieces after Jeremy's accident. However, Ruskusky subsequently agreed "the scaffold was in some pieces" after the accident. Ruskusky clarified that the scaffold was "one section tall." Only one of the scaffold's side frames was on top of Jeremy. Ruskusky noticed that the scaffold had wheels, but he did not check to see if the wheels were in a locked or unlocked position. Also, Ruskusky did not recall seeing an elevated concrete pad in the room where Jeremy fell. Ruskusky did notice that Jeremy's hard hat was lying nearby on the ground. In total, Ruskusky believed he was in the room where Jeremy fell for 10 to 12 minutes.

¶ 30    Ruskusky was trained in the use of scaffolds and scissor lifts. Ruskusky noted that a scissor lift is motorized, so workers may move while elevated and working. A scaffold like the one used by Ariana and Jeremy could not move while the worker is elevated and working. Ruskusky believed scissor lifts are more stable than scaffolds. To utilize scissor lifts, the work area must be clear of materials or "the wheels aren't going to roll *** [and] [y]ou're going to have too many obstructions." Ruskusky testified that, at prior worksites where PJH was the general contractor, PJH dictated where subcontractors could store the debris associated with their work. Based on prior work experience, Ruskusky believed he was required to follow P.J. Hoerr's safety rules.

¶ 31    *Deposition of Steve Verardo*

¶ 32    Steve Verardo was the owner and president of SNS, as well as the sole estimator and project manager. He testified that SNS provided scaffolds that it owned, including the scaffold used by Jeremy on the date of his accident, to facilitate its employees' work at the construction site. SNS employees were responsible for choosing scaffold components, bringing those components to the construction site, erecting the scaffolds, and choosing the placement and height of the scaffolds when completing their work. Verardo stated Jeremy was one of a few individuals who could have erected the scaffold involved in his accident. In addition to scaffolds, SNS owned ladders and scissor lifts.

¶ 33    Verardo was at the construction site the morning of Jeremy's accident but did not enter the room until after it happened. Verardo last saw the scaffold, which was at the construction site for at least a month, a couple days before Jeremy's accident. Verardo did not know of anyone who witnessed Jeremy's accident and had no personal knowledge about the scaffold or Jeremy' positions before or after the accident. He did acknowledge that the incident report, which was

10

compiled the day after the accident, stated that Jeremy was found alongside the scaffold after the accident.

¶ 34    Verardo stated an SNS employee was tasked with cleaning up SNS's debris, off and on, for half a workday. The cleanup would then be repeated as needed the within the next two days. Verardo also was told that on the date of the accident, concrete was being poured outside the room where Jeremy was working. As a result, Hodgson allegedly directed debris to be stored in the room where Jeremy was working. Verardo stated that the room was "full of garbage" because there was no access to a dumpster. He believed this was one of the reasons why Jeremy could not have used a scissor lift. Verardo also noted that there was a three-to-3½-inch height difference between the floor of the room and a concrete pad located in one of the corners of the room. For these reasons, it would have been difficult to drive a scissor lift around the room.

¶ 35    *Deposition of Ross Hodgson*

¶ 36    Ross Hodgson was PJH's construction-site superintendent. His responsibilities included coordinating the work and fulfilling duties contained in PJH's safety manual, which he performed in part by walking around the construction site. During those walks, Hodgson ensured compliance with safety gear, such as hard hats and glasses, and reviewed the work completed and planned by the subcontractors. He also completed weekly safety observation forms, which covered all the work occurring on the construction site, and "toolbox talks." He agreed he had the authority to stop unsafe work occurring at the construction site. He agreed it would have been acceptable for an individual to work at the height of the platform depicted on the reconstructed scaffold shown above in paragraph 21.

¶ 37    Before Jeremy's accident, Hodgson did not recall discussing how SNS employees would safely access elevated areas of the construction site for purposes of completing their work. He

11

also was not aware of any such discussions between PJH and SNS. Hodgson was familiar with the elevated concrete pad situated in the room where Jeremy's accident occurred. He believed that concrete pad was designed to hold mechanical equipment, such as a furnace or water softener. Hodgson believed the concrete pad was elevated three-to-3½ inches off the ground.

¶ 38   At the time of Jeremy's accident, Hodgson was at another nearby construction site. He learned of the accident when an employee of another subcontractor approached him and said, "a guy [from SNS] fell." He immediately went to the construction site and called SNS's project manager, Verardo. Hodgson acknowledged that he documented these events in a written statement after the accident. Hodgson also called PJH's safety director and reported, "someone fell, someone's injured, and 9-1-1 was called."

¶ 39   Contrary to Verardo's testimony, Hodgson did not recall having any conversations with SNS employees about pouring concrete outside the room where Jeremy's accident occurred such that debris had to be stored in that room. Hodgson also did not recall having any discussions with SNS employees about their inability to use a scissor lift in the room where Jeremy's accident occurred. Hodgson agreed that he had the authority to direct where subcontractors could place their materials on the construction site. However, he did not recall any issues relating to the placement of debris on the premises. If SNS was the only subcontractor performing work in that room, then Hodgson believed SNS was responsible for the placement of its debris.

¶ 40   *Deposition of Mike Waibel*

¶ 41   Mike Waibel was PJH's project manager at the time of Jeremy's accident. He was responsible for handling the contracts with NECA and the subcontractors on the construction site. Waibel was also Hodgson's superior at PJH.

12

¶ 42       Waibel believed it was Hodgson's responsibility to walk around the construction site to identify safety issues with the work that was occurring there, including that of subcontractors. Waibel believed that if Hodgson saw something unsafe on the construction site, including with respect to a scaffold, then Hodgson had the authority to stop the work. Waibel agreed it was part of Hodgson's job to proactively "look for unsafe things" on the premises. Hodgson was also responsible for completing safety audits for the construction site, including for subcontractors and scaffolds. Further, Waibel stated Hodgson was charged with coordinating the subcontractors' material-laydown areas and the location of dumpsters for debris. Thus, Hodgson had the authority to direct a subcontractor to remove debris from a particular area on the construction site. Waibel agreed that the use of a scissor lift required an area to be clear of debris.

¶ 43       Waibel was not at the construction site on the date of Jeremy's accident and never saw a scaffold in the area where the accident occurred. Waibel was informed by Hodgson over the phone that Jeremy "fell."

¶ 44                           *Deposition of Hans Hinrichsen*

¶ 45       Hans Hinrichsen was PJH's director of corporate safety. He was responsible for managing workers compensation claims, insurance, jobsite safety audits and observations, and employee training. Both he and Hodgson had the authority to stop unsafe work at the construction site.

¶ 46       Hinrichsen could not recall if he had visited the construction site before Jeremy's accident. When Hinrichsen arrived on the construction site after Jeremy's accident, the scaffold had already been disassembled. He did not know if the wheels on the scaffold were in a locked or unlocked position before Jeremy's accident. Further, Hinrichsen stated that outriggers, which provide support and stability to a scaffold, were not required on the scaffold used by Jeremy, as

13

they were required only if a scaffold had a second-frame work platform. Hinrichsen believed the scaffold used by Jeremy had a first-frame work platform.

¶ 47    Hinrichsen defined debris as "leftover material, outfall from the project." Based on photos taken immediately after Jeremy's accident, Hinrichsen was able to identify various debris in the room, including "some paper," wood or cardboard, screws, insulation rolls, and metal studs.

¶ 48                    *Deposition of Jon Manley*

¶ 49    Jon Manley was a foreman for another subcontractor, Montefusco, at the construction site. Manley believed PJH could stop the work occurring on the construction site because "they were the general contractor *** overseeing the entire job." Before Jeremy's accident, Manley never witnessed PJH stop the work on the construction site.

¶ 50    Manley was in the room where Jeremy's accident occurred approximately 20 minutes prior to it occurring. He witnessed Jeremy and Ariana using a scaffold to hang drywall. Manley observed the scaffold but could not estimate its height. He also observed an elevated concrete pad in the room. However, while he was working in the room, Manley never witnessed the scaffold on top of the elevated concrete pad. The scaffold was in several different positions, but it was always on "flat level ground." Eventually, Manley went to perform work in an adjacent room. At that time, Jeremy was on the scaffold and Ariana was cutting drywall. Manley believed Ariana also left the room to perform work in another location. While in the adjacent room, Manley could hear Jeremy working to drill drywall.

¶ 51    Twenty minutes after he left the room, Manley heard Jeremy "yell for help." He heard Jeremy say, "hey, hey" and then a loud crash and the scattering of screws. He climbed down his ladder and returned to the room where Jeremy was working. He was the first person to enter the

room. Jeremy was "knocked out" and lying on the ground. Jeremy was "in the fetal position [and] convulsing." Manley noticed that Jeremy was "inside of the frame of the scaffold." The scaffold was "framed around" Jeremy's "entire body." Manley did not believe the scaffold was broken into pieces, although he did not examine the scaffold. He noticed Jeremy was no longer wearing a hard hat, as he was when Manley left the room. He believed Jeremy was wearing a black harness or shoulder straps. Manley did not notice drywall around Jeremy's body or debris on the floor of the room. He did not know what caused the accident.

¶ 52                                 *Deposition of Jeffrey Roof*

¶ 53        On the date of Jeremy's accident, Jeffrey Roof was working for a subcontractor, Ace Striping, which had been hired to paint the parking lot on the construction site. Roof was outside at the time of Jeremy's accident; therefore, he did not witness Jeremy's accident or know what caused it. Roof was standing in the parking lot on the construction site when a "gentleman *** [ran] out of the building." Around that same time, a police car arrived at the construction site. Roof stated, "I asked what's going on and *** the [gentleman] just said he had fell, he hit his head."

¶ 54        Thereafter, Roof, who was also a volunteer firefighter, entered the building to offer his assistance. Once in the room, Roof testified that he saw Jeremy "lying on the floor" and a scaffold on the ground. Roof stated Jeremy's body was inside the framing of the scaffold. He clarified by agreeing that some pieces of the scaffold were still connected and were around Jeremy's body. He could not recall if the work platform remained attached to the scaffold. Roof obtained gloves from a police officer and then returned to the room to hold Jeremy's neck. At the time Roof was holding Jeremy's neck, Jeremy was breathing and moaning. Roof observed "an L-

15

shaped wound" on Jeremy's forehead and blood coming from Jeremy's right ear. Roof noticed "construction-related debris" in the room where Jeremy fell.

¶ 55                                   *PJH's Incident Review Report*

¶ 56         On December 15, 2016, PJH completed an incident review report of Jeremy's accident. Regarding Jeremy and Ariana's work, the report stated, "[w]ork done at height was completed with the assistance of a \*\*\* scaffold system which was only placed one frame section in height with a work platform between the rails." The report also stated, "[a]t approximately 1:45 PM, Mr. Ariana heard shouting coming from [Jeremy]'s work area followed by what sounded like a scaffold crash." Ariana found Jeremy "unresponsive and lying on the ground."

¶ 57         Regarding the accident's "causal factors," the report stated, "SNS work on site was suspended pending incident investigation and updated safe work procedures." However, "due to the lack of immediate witnesses, no first-hand accounts of the actual incident were able to be obtained." Witness statements were procured from the individuals who responded to the accident. Based on those witness statements, the incident report found, "there could be multiple causes to the incident." The incident report noted the brakes on the scaffold were not in a locked position but stated this could have been because of the need to facilitate EMS movement around Jeremy immediately after the accident. The incident report also noted that the area where Jeremy was working had an "uneven" surface, which "may have posed an issue for a scaffold system on rolling wheels." The incident reported stated, "[t]he area which was not completed [with drywall] was directly above a raised concrete mechanical pad." Jeremy was found "lying next to the pad and his drill gun [was] adjacent to [the pad] as well."

¶ 58                                     *Circuit Court's Ruling*

16

¶ 59    On December 2, 2020, the circuit court held a hearing on the parties' summary judgment motions. At the conclusion of the hearing, the court found that there was no genuine issue of material fact that could be presented to a jury. Further, the court could not "find any way that proximate cause could ever be shown against either" PJH or SNS. Therefore, the court granted PJH's motion for summary judgment on Huston's first amended complaint and then found SNS's third-party liability to PJH was extinguished. The court issued its written ruling two days later.

¶ 60    Huston appealed the circuit court's grant of summary judgment in favor of PJH. PJH filed a cross-appeal from the court's dismissal of its third-party complaint against SNS to allow this court to retain jurisdiction over the dismissal of PJH's third-party complaint.

¶ 61                                    II.  ANALYSIS

¶ 62    Huston's first argument on appeal is that the circuit court erred when it granted summary judgment in favor of PJH.  Huston claims that the evidence was sufficient to raise a genuine issue of material fact as to whether PJH failed to maintain a safe jobsite and thereby proximately caused Jeremy's accident.

¶ 63    Summary judgment "shall be rendered without delay if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). It is a drastic measure that is proper only if the moving party's right to a judgment as a matter of law is clear and free from doubt. *Seymour v. Collins*, 2015 IL 118432, ¶ 42. Summary judgment must be denied if (1) there is a genuine issue of material fact, (2) reasonable persons could draw divergent inferences from the undisputed material facts, or

17

(3) reasonable persons could differ on the weight given to factors of a legal standard. *Id.*; accord *Smith v. Integrated Management Services, LLC*, 2019 IL App (3d) 180576, ¶ 15.

¶ 64    Further, a plaintiff is not required to prove its case in response to a motion for summary judgment, but sufficient evidence must be presented to support the elements of the plaintiff's cause of action. *Rogers v. Matanda, Inc.*, 393 Ill. App. 3d 521, 526 (2009). If a plaintiff fails to establish a required element for the cause of action, then it is appropriate for the circuit court to grant summary judgment for the defendant. *Id.* The circuit court must construe the record strictly against the moving party and liberally for the nonmoving party. *Seymour*, 2015 IL 118432, ¶ 42. Our review of the circuit court's grant of a motion for summary judgment is *de novo*. *Id.*

¶ 65    In this case, Huston's first amended complaint was filed under sections 1 and 2 of the Wrongful Death Act. Thus, Huston was required to prove that (1) PJH owed Jeremy a duty of care, (2) PJH breached that duty of care, (3) PJH's breach of its duty of care proximately caused Jeremy's death, and (4) monetary damages resulted to persons designated under the Act. See *Lough v. BNSF Ry. Co.*, 2013 IL App (3d) 120305, ¶ 20 (citing 740 ILCS 180/1 (West 2010)); *Bovan v. American Family Life Insurance Co.*, 386 Ill. App. 3d 933, 938 (2008)). This appeal involves only the third element—whether PJH proximately caused Jeremy's death.

¶ 66    The question of proximate cause has two distinct elements—cause in fact and legal cause. *Pommier v. Jungheinrich Lift Truck Corp.*, 2018 IL App (3d) 170116, ¶ 42; accord *Lough*, 2013 IL App (3d) 120305, ¶ 21. "Cause in fact" refers to whether the defendant's conduct is a material factor in bringing about the plaintiff's injury such that it would not have occurred in the absence of the defendant's conduct. *Lough*, 2013 IL App (3d) 120305, ¶ 21 (quoting *Majetich v. P.T. Ferro Construction Co.*, 389 Ill. App. 3d 220, 224 (2009)). "Legal cause" implicates the question of foreseeability. *Id.* (quoting *Majetich*, 389 Ill. App. 3d at 224).

18

¶ 67        Proximate cause typically presents a question of fact. *Pommier*, 2018 IL App (3d)

170116, ¶ 42. However, courts may decide a proximate cause issue as a matter of law if the

evidence proves the plaintiff "would never be entitled to recover." *Id.* (quoting *Abrams v. City of*

*Chicago*, 211 Ill. 2d 251, 257-58 (2004)). The plaintiff must prove, with "affirmative and

positive evidence," that the defendant's negligence was "more probably than not" the proximate

cause of the plaintiff's injuries. *Lough*, 2013 IL App (3d) 120305, ¶¶ 20-21 (quoting *Holton v.*

*Memorial Hospital*, 176 Ill. 2d 95, 107 (1997); *Majetich*, 389 Ill. App. 3d at 224). Otherwise, the

plaintiff fails to establish a genuine issue of material fact in the context of a motion for summary

judgment. *Lough*, 2013 IL App (3d) 120305, ¶ 21 (quoting *Majetich*, 389 Ill. App. 3d at 224).

This is, in part, because proximate cause cannot be based on speculation, surmise, or conjecture.

*Pommier*, 2018 IL App (3d) 170116, ¶ 44 (quoting *Majetich*, 389 Ill. App. 3d at 224); see also

*Lough*, 2013 IL App (3d) 120305, ¶ 24 (stating evidence of proximate cause must not be

contingent, speculative, or possible but, instead, of such a degree of probability as to create a

reasonable certainty of a causal connection between the injuries and the event at issue).

¶ 68        Importantly, circumstantial evidence can be sufficient to establish proximate cause if

reasonable inferences may be drawn from that evidence. *Lough*, 2013 IL App (3d) 120305, ¶ 34.

However, as alluded to above, when "a 'plaintiff relies upon circumstantial evidence to establish

proximate cause to defeat a motion for summary judgment, the circumstantial evidence must be

of such a nature and so related as to make the conclusion more probable as opposed to merely

possible.' " *Id.* (quoting *Majetich*, 389 Ill. App. 3d at 225); accord *Rogers*, 393 Ill. App. 3d at

527.

¶ 69        Huston argues that a genuine issue of material fact exists because debris was placed in

the room where Jeremy was working at the direction of PJH, which created an uneven floor

19

surface and an unsafe work condition that was left unmitigated by PJH. Thus, PJH allegedly "prevented Jeremy from using a lift, which would have prevented [his] fall." For these reasons, Huston argues it is reasonable to infer from the circumstantial evidence that PJH proximately caused Jeremy's fatal injuries after debris became entangled in the scaffold's wheels, causing that piece of equipment to tip over. We disagree.

¶ 70    Our review of the record reveals that the circumstantial evidence of what caused Jeremy's accident is insufficient under the law to survive summary judgment. Speculation and conjecture are insufficient to establish proximate cause unless the circumstances are so related that the argued-for interpretation of an incident is the only probable one. *Berke v. Manilow*, 2016 IL App (1st) 150397, ¶ 34-35. Here, Jeremy was hanging drywall when he was injured. No one was present when Jeremy was injured, nor had anyone else been present in the room for 20 minutes. Ariana had seen the scaffold at that time and stated that it was locked in place and ready for use. After yelling was heard, Jeremy was found on the floor in the mechanical room and the scaffold was tipped over. The observations of the individuals who saw Jeremy post-incident were not consistent with each other regarding where he was in relation to the scaffold. There was no evidence to indicate whether Jeremy was even on the scaffold immediately before he was injured. Under these circumstances, we hold that Huston could not prove PJH's conduct proximately caused Jeremy's injury and subsequent death. See *Berke*, 2016 IL App (1st) 150397, ¶ 34. Thus, the circuit court did not err when it granted summary judgment in favor of PJH.

¶ 71    Huston's second argument on appeal is that the circuit court erred when it found that PJH did not retain control over the jobsite. Huston claims that both contractual agreements and jobsite conduct by PJH were sufficient to raise a genuine issue of material fact as to whether it

20

retained control.  Not only did the circuit court not address this issue, but there is also no need for this court to address it due to our ruling on the previous issue.

¶ 72        Additionally, our ruling on the first issue obviates the need to address PJH's cross-appeal. The circuit court correctly dismissed PJH's third-party complaint for contribution as moot.

¶ 73                                III.  CONCLUSION

¶ 74        The judgment of the circuit court of Peoria County is affirmed.

¶ 75        Affirmed.